IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

FILED
DEC 13 2017

CARMELITA REEDER SHINN, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA.
BY _Andia Coa_ ,DEPUTY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. CR 17-290 M |
| | ) | |
| vs. | ) | Violations: |
| | ) | 18 U.S.C. § 1349 |
| DANIEL WEBSTER KEOGH and | ) | 18 U.S.C. § 1014 |
| DANIELLE KEOGH, | ) | 18 U.S.C. § 2 |
| a/k/a Danielle E. Truitt, | ) | 18 U.S.C. § 1001(a)(2) |
| | ) | 18 U.S.C. § 1343 |
| Defendants. | ) | 18 U.S.C. § 666(a)(1)(A) |
| | ) | 18 U.S.C. § 981(a)(1)(C) |
| | ) | 18 U.S.C. § 982(a)(2)(A) |
| | ) | 28 U.S.C. § 2461(c) |

INDICTMENT

The Federal Grand Jury charges:

At all times relevant to this Indictment:

**The Defendants and Their Business Entities**

1.    **DANIEL WEBSTER KEOGH ("WEB KEOGH")** was a resident of the Western District of Oklahoma and a controlling officer of several businesses, including Triton Scientific, LLC ("Triton"), The Keogh Group, LLC ("Keogh Group"), EMB Energy, LLC ("EMB Energy"), and others.

2.    **DANIELLE KEOGH**, a/k/a Danielle Truitt (**"DANIELLE KEOGH"**), was a resident of the Western District of Oklahoma and an officer of several businesses, including Triton, EMB Energy, and Erys, LLC ("Erys"). **WEB KEOGH** and **DANIELLE KEOGH** were married in December 2010.

1

3.    Triton was an Oklahoma limited liability company, with its principal place of business in the Western District of Oklahoma. **WEB KEOGH** was the President and Chief Executive Officer of Triton. **DANIELLE KEOGH** was the Director of Finance at Triton.

4.    Keogh Group was an Oklahoma limited liability company, with its principal place of business in the Western District of Oklahoma. **WEB KEOGH** was the President and Chief Executive Officer of Keogh Group, and **DANIELLE KEOGH** was the Chief Financial Officer of Keogh Group. Keogh Group owned and was a member of Triton.

5.    EMB Energy was a Delaware C-Corporation, with its principal place of business in the Western District of Oklahoma. **WEB KEOGH** created EMB Energy in 2009 to research energy storage capabilities with the goal of commercializing a storage device. **WEB KEOGH** was the Chairman and Chief Executive Officer of EMB Energy. **DANIELLE KEOGH** was the Senior Vice President of Finance of EMB Energy.

6.    Erys was an Oklahoma limited liability company, with its principal place of business in the Western District of Oklahoma. Erys provided accounting, payroll, administrative and general management, and other back-office services to government contractors, including Keogh Group affiliates. **DANIELLE KEOGH** was the sole member and President of Erys.

2

**OSU-UML**

7.    Oklahoma State University—University Multispectral Laboratories, LLC ("OSU-UML") was an Oklahoma limited liability company, with its principal place of business in the Western District of Oklahoma. OSU-UML was a non-profit research center launched in April 2006 to provide research, development, testing, evaluation, and tactical training to the United States Department of Defense and other entities. OSU-UML was wholly owned by OSU, a state land grant university. OSU provided a Board of Directors and an Executive Director—an OSU employee—to govern OSU-UML's activities.

8.    OSU-UML was a government-owned, contractor-operated facility. Triton operated OSU-UML and provided all staffing to carry out OSU-UML's programs. By agreement effective January 1, 2008, OSU-UML contracted with Triton to provide all services necessary for the management, operation, maintenance, and reporting of OSU-UML's operations. In 2011 and 2012, Triton had approximately 80-100 employees billing time on OSU-UML projects. Triton's biweekly payroll invoice to OSU-UML usually exceeded $250,000. Triton agreed to operate OSU-UML "so that no obligation is made and no expense is incurred in excess of available funds, unless specifically authorized by the Board of Directors" of OSU-UML.

9.    **WEB KEOGH** was OSU-UML's Laboratory Director until he

3

stepped down from that role in November 2012.

10.    **DANIELLE KEOGH** was OSU-UML's Director of Finance and/or the Director of Finance and Contracts from in or about 2008 until in or about October 2011.  On or about November 15, 2011, Erys subcontracted to perform general administration and accounting services for OSU-UML.  In late 2011 and 2012, **DANIELLE KEOGH** continued to perform work for— and bill hours through Triton to—OSU-UML.

### Other Parties

11.    First Pryority Bank ("First Pryority") was a financial institution with locations in Tulsa and Pryor, Oklahoma.  First Pryority's deposits were insured by the Federal Deposit Insurance Corporation ("FDIC").

12.    Lawrence Livermore National Laboratory ("LLNL") was a federal research facility in Livermore, California.  LLNL was primarily funded by the United States Department of Energy and was operated by a private partnership called Lawrence Livermore National Security, LLC ("LLNS").

13.    The United States Department of Agriculture ("USDA") was an executive agency led by the Secretary of Agriculture.  The USDA's Rural Development Administration offered loan guarantees to businesses through banks to support economic development.  Eligible uses of the guarantee funds included (1) purchase of machinery and equipment, (2) purchase and development of land, buildings, and associated infrastructure for commercial

4

or industrial properties, or (3) commercially available energy projects that have at least one year of a proven and reliable operating history and performance data based on established design and installation procedures. Research and development loans were not eligible for Rural Development Administration guarantees. USDA prioritized projects located in rural and depressed areas, particularly those areas with populations under 25,000.

14. Rocky Mountain Power ("RMP") was a division of PacifiCorp, an Oregon corporation, with its principal office in Salt Lake City, Utah. RMP and its affiliates owned facilities for public electric service in Utah, Wyoming, Idaho, Oregon, Washington, and California.

## COUNT 1
### (Bank Fraud Conspiracy)

### Battery Loan

15. The Federal Grand Jury incorporates paragraphs 1-14 by reference.

16. Beginning in late 2009 or early 2010, **WEB KEOGH** communicated with LLNL about a collaborative effort to research and develop electromechanical battery technology. The proposed battery concept involved a nearly frictionless flywheel battery with an electrostatic or electromechanical generator that would first be built on a small scale to determine whether it proved conceptually sound. If a working small-scale

5

prototype was built, the plan was to attempt to scale up the technology to larger battery sizes and ultimately commercialize the product.

17.    From in our around July 2010 until at least in or around October 2012, in the Western District of Oklahoma and elsewhere,

-------------------------- **DANIEL WEBSTER KEOGH and**
**DANIELLE KEOGH,**
**a/k/a Danielle Truitt,** -------------------------------------

knowingly, intentionally, and with interdependence, combined, conspired, and agreed with each other, and with others known and unknown to the Federal Grand Jury, to commit the offense of bank fraud, in violation of Title 18, United States Code, Section 1344.

### The Object of the Conspiracy

18.    The object of the conspiracy was to acquire a $3.2 million loan from First Pryority, guaranteed by USDA's Rural Development Administration. The coconspirators falsely represented that the loan would be used to purchase machinery and equipment and did not disclose that the loan proceeds were actually for a research and development project.

### Manner and Means

19.    The object of the conspiracy was accomplished as follows:

A.    In or around September 2010, on behalf of EMB Energy, **WEB KEOGH** signed a research and development agreement to provide scheduled funding and in-kind contributions to an electromechanical battery research

6

project at LLNL. Under the agreement, if a small electromechanical battery prototype was successfully built and tested, and the technology was successfully scaled up to create larger electromechanical batteries, EMB Energy would eventually own a prototype of a medium-sized battery model and a utility-sized battery model. EMB Energy planned then to commercialize the technology to manufacture utility-sized batteries.

B.     In or around July 2010, **WEB KEOGH** and **DANIELLE KEOGH** contacted First Pryority about a loan for Triton to purchase $4 million in capital equipment described as an electromechanical "battery or set of batteries." **WEB KEOGH** provided a "proposed equipment loan" summary that stated Triton had been awarded a $24 million defense contract and it "must purchase and install a significant piece of capital equipment for electrical storage."

C.     **WEB KEOGH** and **DANIELLE KEOGH** did not disclose to First Pryority that they intended to use the loan proceeds to fund a research agreement between EMB Energy and LLNL for battery prototypes. Instead, **WEB KEOGH** and **DANIELLE KEOGH** falsely represented to First Pryority and USDA that Triton was purchasing machinery and equipment—specifically, a $4 million battery or set of batteries—to be installed at an OSU-UML facility, which would serve as collateral for the loan.

D.     Based on false and incomplete information from **WEB KEOGH**

7

and **DANIELLE KEOGH**, First Pryority approved and funded a $3.2 million loan to Triton, with 80% of the loan funds guaranteed by USDA's Rural Development Administration.

E.     In 2011 and 2012, to conceal the loan's true purpose, **WEB KEOGH** and **DANIELLE KEOGH** falsely inflated the battery's value and misrepresented the status of the battery in Triton's financial statements.

### Acts in Furtherance of the Conspiracy

20.     To effect the object of the conspiracy, **WEB KEOGH** and **DANIELLE KEOGH** committed the following overt acts, among others:

A.     On or about July 12, 2010, **WEB KEOGH** e-mailed a First Pryority loan officer—and copied **DANIELLE KEOGH**—with a "brief description of the equipment we wish to procure." The next day, **WEB KEOGH** provided documentation to First Pryority about a $4 million proposed loan to purchase capital equipment.

B.     On or about September 26, 2010, on behalf of EMB Energy, **WEB KEOGH** signed a Cooperative Research and Development Agreement ("CRADA") between EMB Energy and LLNS. The CRADA was an agreement to fund and conduct research and development of an electromechanical battery concept at LLNL. Work under the CRADA was to be performed on a "best efforts basis," without any guarantee that an electromechanical battery would be developed. The CRADA outlined a "collaborative effort" ultimately

8

to develop a utility-scale electromechanical battery—a 250 kWh prototype battery—within approximately 112 weeks, after first successfully building a 5 kWh prototype battery and then two 25 kWh prototype batteries.

C.   The CRADA's Statement of Work included a detailed table of "deliverables" and timelines for the completion of a 5 kWh "bench scale component prototype," two 25 kWh prototypes (one for LLNS and one for EMB Energy), and a 250 kWh prototype. The CRADA's estimated project cost was over $22 million, including more than $17 million of in-kind contributions by EMB Energy and more than $4 million of EMB Energy monetary contributions to LLNS.

D.   On or about September 26, 2010, **WEB KEOGH** signed and provided to First Pryority and USDA an Application for Loan Guarantee for the requested loan, indicating the project was to be located in Chilocco, Oklahoma. **WEB KEOGH** stated that USDA's required feasibility study and architectural and engineering plans were not "applicable" because the loan was for "equipment purchase only." For the cost estimates and forecasts of contingency funds, **WEB KEOGH** stated: "The project entails the purchase of uninterruptable power supply for Triton's facility."

E.   In or around late September 2010, **WEB KEOGH** and **DANIELLE KEOGH** provided to First Pryority and USDA a summary of Triton's activities and a Mass Energy Storage Addendum to request a $4

9

million equipment loan. The Addendum represented that the loan's purpose was to "[p]urchase capital equipment." The Addendum further represented that Triton was "interested in procuring a battery or set of batteries between 250kWh to 2 MWh to install at the outdoor test and training facilities in Lawton and Chilocco," and that OSU-UML would lease the purchased equipment from Triton, for seven years at $25,000 per month, when Triton was not otherwise using the equipment. **WEB KEOGH** told First Pryority and USDA that the batteries purchased would have "an operational lifetime of at least 20 years" and could operate "either on or off of the national grid" using wind power, solar power, or existing electrical grids.

F.    **WEB KEOGH** also provided to USDA a proposed balance sheet for Triton, dated September 27, 2010, showing that the requested loan would result in a $4 million acquisition of machinery and equipment in October 2010. The "Use of Proceeds" summary stated the loan proceeds would be used to purchase machinery and equipment worth $4 million.

G.    On October 29, 2010, EMB Energy signed an agreement with RMP to develop the electromechanical battery technology with prototype testing, and to install a demonstration project—the first utility-scale battery—at an RMP site. The agreement committed priority rights to RMP for the production of subsequent utility-sized batteries.

H.    On or about December 22, 2010, **WEB KEOGH** signed a USDA

10

"Conditional Commitment for Guarantee" that specified the loan was for "M&E purchases" of $4 million. The Conditional Commitment provided that the collateral for the loan would be a first lien on all machinery and equipment purchased with loan funds.

I.    On or about December 29, 2010, **WEB KEOGH** signed a USDA "Loan Closing Certification" in which he verified there had been no changes in loan conditions since signing the Conditional Commitment. He also verified: "All planned property acquisition has been completed. All development has been substantially completed[.]" **WEB KEOGH** verified that Triton had "marketable title to the collateral" subject only to the bank's security interest pursuant to the loan and that such "collateral is sufficient to secure the loan." In addition, **WEB KEOGH** signed a "Business Purpose Statement" where he verified that loan proceeds would be used to "purchase equipment for Triton Scientific, LLC use."

J.    Neither **WEB KEOGH** nor **DANIELLE KEOGH** ever disclosed the existence of the CRADA, its anticipated timelines for prototypes, or Triton's intent to use loan proceeds for EMB Energy to conduct battery research and development. Neither **WEB KEOGH** nor **DANIELLE KEOGH** ever disclosed to First Pryority or USDA that EMB Energy would not own the 5 kWh prototype, and that EMB Energy would only own a prototype if the battery project produced a working 25 kWh prototype.

11

K.    On or about January 2, 2011, **DANIELLE KEOGH** sent First Pryority a purported invoice—from EMB Energy to Triton—in support of the first draw request on the loan. The invoice referenced a monthly bill for "up to 2.00 Megawatt Hour battery system" with a contract value of $4,158,461.93, to be shipped via Williams International and delivered to Triton in Ponca City, Oklahoma. The invoice's line item components included "Manufacturing Installation" of a "Utility Scale Electro-mechanical Battery" and "Fly Wheel." According to the invoice, EMB Energy's incurred costs for December 2010 were $1,950,986.86. The invoice directed Triton to send payment to an EMB Energy address in Salt Lake City. First Pryority advanced to Triton $1,560,789.48—80% of the costs reflected on the invoice.

L.    **DANIELLE KEOGH** sent to First Pryority three more purported invoices from EMB Energy to Triton, with similar references to a "battery system," a contract value of $4,158,461.93, shipping via Williams International, and line items for "Manufacturing Installation" of a "Utility Scale Electro-mechanical Battery" and a "Fly Wheel." The second invoice, sent on or about January 31, 2011, referenced expenses from January 2011 of $850,934.31. The third invoice, sent on or about March 18, 2011, referenced expenses from February 2011 of $773,780.35. The fourth invoice, sent on or about April 11, 2011, referenced expenses from March 2011 of $736,133.28. First Pryority advanced to Triton 80% of the costs reflected on the second and

12

third monthly invoices. Based on the fourth invoice, First Pryority advanced the remaining $339,438.80 on the loan to Triton.

M.    When Triton received each draw of loan proceeds from First Pryority, **WEB KEOGH** and **DANIELLE KEOGH** routed the funds primarily to EMB Energy, LLNL, or other vendors for work on research and development of electromechanical battery technology. After the first advance, however, **WEB KEOGH** and **DANIELLE KEOGH** directed approximately $559,388 of loan proceeds to pay back an earlier EMB Energy investor who wanted a return on his investment. The research and development work primarily occurred at LLNL, with research into component parts in Michigan and Utah. No work was done in Chilocco.

N.    On or about May 16, 2011, **DANIELLE KEOGH** sent First Pryority a balance sheet for Triton dated as of March 31, 2011. The balance sheet showed a battery as a fixed asset valued at $1,392,578.29. Similarly, **DANIELLE KEOGH** provided and caused to be provided to First Pryority balance sheets for Triton—dated as of June 30, 2011, and September 30, 2011—also showing the battery as a fixed asset valued at $1,392,578.29.

O.    Around January 2012, First Pryority requested a certificate of insurance to evidence the required property insurance on collateral at a value of $3.2 million for the battery. A Triton representative secured coverage of a purported "PX3 Electro-Magnetic Battery" for a value of $3.2 million, and on

January 21, 2012, the insurance company sent to First Pryority a certificate of insurance. The Certificate indicated coverage for $3.2 million of a "PX3 Electro-Mechanical Battery" located at OSU-UML in Edmond, Oklahoma.

P.      On or about January 13, 2012, First Pryority e-mailed **DANIELLE KEOGH** about why the battery purportedly purchased for $4 million was only recorded as a fixed asset worth $1.392 million on Triton's books. On or about January 23, 2012, **DANIELLE KEOGH** e-mailed **WEB KEOGH** about First Pryority's concern with the battery's value on Triton's books. She proposed increasing the asset "Battery" to $4 million on Triton's books by recoding all battery-related expenses into a "Battery job," including salaries, wages, 401k benefits, professional fees, rent, and travel.

Q.      On or about February 24, 2012, Triton sent to First Pryority a balance sheet dated as of December 31, 2011, which showed a battery as a fixed asset valued at $4,172,979.64. On or about April 23, 2012, Triton sent to First Pryority another balance sheet dated as of March 31, 2012, which also showed a battery as a fixed asset valued at $4,172,979.64.

R.      On or about October 22, 2012, USDA contacted First Pryority requesting a list of the assets purchased with the battery loan funds. First Pryority in turn contacted Triton with the request. On or about October 25, 2012, **DANIELLE KEOGH** and **WEB KEOGH** caused Triton's financial statements for 2011 to be sent to First Pryority. Triton's statement of assets

14

included a fixed asset described as a "Battery (in progress)" valued as $4,172,980. Note B to the financial statements stated: "The Battery is being tested for safety and performance at Livermore National Laboratory in California. After it passes the testing phase then it will be installed at the Chilocco site in Oklahoma." Note E described the battery loan with First Pryority. It stated: "The purpose of the loan is to build and operate energy plant and is secured by the business assets."

S.   In or around December 2012, Triton defaulted on the battery loan, with a current principal balance of more than $3 million owed to USDA and First Pryority. In April 2013, LLNL terminated the CRADA based on a lack of funding from EMB Energy to continue. No working electromechanical battery—even the smallest 5 kWh prototype—was ever fully assembled under the CRADA. Accordingly, neither EMB Energy nor Triton ever obtained any ownership interest or title to a tangible, working battery.

All in violation of Title 18, United States Code, Section 1349.

## COUNT 2
### (False Statement)

21.   The Federal Grand Jury incorporates paragraphs 1-5 and 11-20 by reference.

22.   On or about September 26, 2010, in the Western District of Oklahoma and elsewhere,

15

------------------------- **DANIEL WEBSTER KEOGH** -------------------------------

knowingly made a false statement for the purpose of influencing First

Pryority and USDA's Rural Development Administration to approve a $3.2

million loan to Triton.  In particular, **WEB KEOGH** stated that the

requested loan was for "equipment purchase only" at Triton's facility in

Chilocco, Oklahoma.  Instead, **WEB KEOGH** intended to use the loan

proceeds to fund research and development primarily in California into

battery technology, with no certainty that such research and development

would result in equipment delivered or installed in Chilocco, Oklahoma.

All in violation of Title 18, United States Code, Section 1014 and Title

18, United States Code, Section 2.

### COUNT 3
### (False Statement)

23.    The Federal Grand Jury incorporates paragraphs 1-5 and 11-20

by reference.

24.    On or about September 27, 2010, in the Western District of

Oklahoma and elsewhere,

------------------------- **DANIEL WEBSTER KEOGH** -------------------------------

knowingly made a false statement and willfully overvalued property for the

purpose of influencing First Pryority and USDA's Rural Development

Administration to approve a $3.2 million loan to Triton.  In particular, **WEB**

**KEOGH** stated that the requested loan was to "purchase and install a significant piece of capital equipment for electrical storage," described as a "battery or set of batteries" related to a defense contract. **WEB KEOGH** also provided a balance sheet showing the requested loan would result in $4 million of new machinery and equipment for Triton.  Instead, **WEB KEOGH** intended to use the loan proceeds to fund research and development into battery technology, with no certainty that such research and development would result in marketable title or interest in capital equipment.

All in violation of Title 18, United States Code, Section 1014 and Title 18, United States Code, Section 2.

## COUNT 4
### (False Statement)

25.    The Federal Grand Jury incorporates paragraphs 1-5 and 11-20 by reference.

26.    On or about December 29, 2010, in the Western District of Oklahoma and elsewhere,

-------------------------- **DANIEL WEBSTER KEOGH** --------------------------------

knowingly made a false statement and willfully overvalued property for the purpose of influencing First Pryority and USDA's Rural Development Administration to approve a $3.2 million loan to Triton.  In particular, **WEB KEOGH** verified that "[a]ll planned property acquisition has been completed"

and that "[a]ll development has been substantially completed[.]" **WEB KEOGH** also verified that Triton had "marketable title to the collateral" that was "sufficient to secure the loan." He knew, however, that the "battery or set of batteries" purportedly being purchased did not yet exist, so no property acquisition or development of that property had been completed. Further, **WEB KEOGH** also knew that the collateral for a $4 million battery did not exist, and that Triton had no marketable title to the collateral at that time.

All in violation of Title 18, United States Code, Section 1014.

### COUNT 5
### (False Statement)

27.    The Federal Grand Jury incorporates paragraphs 1-5 and 11-20 by reference.

28.    On or about December 29, 2010, in the Western District of Oklahoma and elsewhere,

-------------------------- **DANIEL WEBSTER KEOGH** ---------------------------

knowingly and willfully made a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of USDA, an agency of the executive branch of the United States government. Specifically, in loan closing documents for a $3.2 million loan guaranteed by USDA's Rural Development Administration, **WEB KEOGH** falsely represented that the loan's purpose was to purchase machinery and equipment. He instead

intended to and did use the loan proceeds to fund EMB Energy's research and hopeful development of a utility-scale electromechanical battery, pursuant to a CRADA that **WEB KEOGH** did not disclose to USDA.

All in violation of Title 18, United States Code, Section 1001(a)(2).

## COUNTS 6-9
### (False Statement)

29.     The Federal Grand Jury incorporates paragraphs 1-5 and 11-20 by reference.

30.     On or about the following dates, in the Western District of Oklahoma and elsewhere,

-------------------------- **DANIEL WEBSTER KEOGH and
DANIELLE KEOGH,
a/k/a Danielle Truitt,** --------------------------------------

knowingly made a false statement and willfully overvalued property for the purpose of influencing First Pryority and USDA's Rural Development Administration to fund loan advances on a $3.2 million loan to Triton.  In particular, the following purported invoices from EMB Energy to Triton, submitted to First Pryority by **DANIELLE KEOGH** and others working for Triton, included false references to a battery system, false line items for component parts, false references to the shipment of such items to Ponca City, false references to a purchase agreement between Triton and EMB Energy, and a false contract value of $4,158,461.93 for the battery:

| Count | Date Submitted | Monthly Costs | Amount Advanced |
|:-----:|:--------------:|:-------------:|:---------------:|
| 6 | Jan. 2, 2011 | $1,950,986.86 | $1,560,789.49 |
| 7 | Jan. 31, 2011 | $850,934.31 | $680,747.44 |
| 8 | March 18, 2011 | $773,780.35 | $619,024.28 |
| 9 | April 11, 2011 | $736,133.28 | $339,438.80 |

All in violation of Title 18, United States Code, Section 1014 and Title 18, United States Code, Section 2.

## COUNT 10
### (False Statement)

31. The Federal Grand Jury incorporates paragraphs 1-5 and 11-20 by reference.

32. On or about October 25, 2012, in the Western District of Oklahoma and elsewhere,

-------------------------- **DANIEL WEBSTER KEOGH and
DANIELLE KEOGH,
a/k/a Danielle Truitt,** -------------------------------------

knowingly made a false statement and willfully overvalued property for the purpose of influencing First Pryority and USDA's Rural Development Administration to maintain its loan relationship with Triton. In particular, **DANIELLE KEOGH** and **WEB KEOGH** caused Triton's financial statements to be sent to First Pryority that listed a battery as a fixed asset owned by Triton and valued at $4,172,980. The Notes indicated the "Battery"

20

was being tested for safety and performance in California and would be installed at the Chilocco site in Oklahoma. Instead, **WEB KEOGH** and **DANIELLE KEOGH** knew at that time Triton had no title or ownership in a $4 million working battery, and the battery concept was still in a pre-prototype stage of assembly.

All in violation of Title 18, United States Code, Section 1014 and Title 18, United States Code, Section 2.

## COUNT 11
### (False Statement)

33.    The Federal Grand Jury incorporates paragraphs 1-5 and 11-20 by reference.

34.    At all times relevant to this Indictment, Triton had a separate line of credit with First Pryority. On or about May 30, 2012, First Pryority requested Triton's 2011 balance sheet and income statement, to renew Triton's $2 million line of credit that then had a principal balance of approximately $1,954,600.75. On or about June 5, 2012, Triton's revolving line of credit was renewed by First Pryority.

35.    In or around January 2013, Triton defaulted on its line of credit with First Pryority.

36.    On or about May 31, 2012, in the Western District of Oklahoma and elsewhere,

21

------------------------- DANIELLE KEOGH,
a/k/a Danielle Truitt, -----------------------------------

knowingly made a false statement for the purpose of influencing First Pryority to renew a $2 million revolving line of credit to Triton. In particular, **DANIELLE KEOGH** sent a Triton financial statement and tax return for 2011, listing the battery as a fixed asset worth $4,172,979.64 on the financial statement, and as "buildings and depreciable assets" worth $4,172,980 on the tax return. **DANIELLE KEOGH** knew, however, that Triton had no title or ownership in a $4 million working battery at that time, and the battery concept was still in a pre-prototype stage of assembly.

All in violation of Title 18, United States Code, Section 1014 and Title 18, United States Code, Section 2.

## COUNT 12
### (Conspiracy to Defraud Commuter Air Technology)

37.    The Federal Grand Jury incorporates paragraphs 1–20 by reference.

### OSU-UML's Federal Defense Contracts

38.    Commuter Air Technology, Inc. ("CAT") was an aerospace and defense corporation with its principal place of business in the Western District of Oklahoma. Among other services, CAT provided to the United States military—during wartime efforts—certain intelligence, surveillance, and reconnaissance with special-mission aircraft.

22

39.    From in or around 2010 until late 2012, OSU-UML signed a series of contracts with the United States Special Operations Command ("SOCOM") to support the government's Jungle Advance Under Dense-vegetation Imaging Technology ("JAUDIT") sensor activities in war zones. OSU-UML was the prime contractor with SOCOM. Related to each contract with SOCOM, OSU-UML signed separate subcontractor agreements with CAT and any other necessary subcontractors. CAT performed the actual wartime reconnaissance and surveillance work required by SOCOM. OSU-UML's role as a prime contractor was limited to managing the subcontractors and preparing billing submissions to the federal government.

40.    Approximately once each month, CAT billed OSU-UML for CAT's services incurred for the JAUDIT work. OSU-UML then submitted to the federal government an invoice for all expenses from that month, including CAT's costs, any other subcontractor costs, and OSU-UML's costs for managing the contract. OSU-UML was responsible, after receiving payment from the federal government, to pay CAT and any other subcontractor. Given CAT's primary role in providing the JAUDIT services, OSU-UML generally owed to CAT approximately 85-90% of the total payment that OSU-UML received from the federal government for a billing period.

41.    The subcontractor agreements between CAT and OSU-UML specified the timing of OSU-UML's obligations to pay CAT. Under the CAT-

1903 agreement, OSU-UML promised to pay CAT within 45 days after receiving CAT's invoice. The CAT-0004 agreement required OSU-UML to pay CAT's invoiced expenses within 30 days after OSU-UML received payment from the federal government.

42.    On or about November 9, 2012, CAT management contacted OSU with concerns about **WEB KEOGH** and a large balance owed to CAT for JAUDIT services. On or about November 13, 2012, **WEB KEOGH** stepped down as Laboratory Director for OSU-UML. On or about December 21, 2012, OSU transferred $5 million to OSU-UML to pay outstanding balances owed to subcontractors. On or about December 24, 2012, OSU-UML wire transferred $3,080,225.93 to CAT for overdue JAUDIT invoices for which the federal government had already paid OSU-UML.

### Liberté

43.    By in or about September 2011, **DANIELLE KEOGH** had started plans to open in Oklahoma City a high-end women's clothing boutique named Liberté. **DANIELLE KEOGH** managed the store's opening, including out-of-state trips to purchase inventory and meetings with an architect, construction company, and a design firm to design the space. Liberté opened in Oklahoma City in late May 2012.

### $1.675 Million Transfers to Trustees

44.    In February 2012, **WEB KEOGH** started communicating with

24

two individuals about a potential multi-million dollar "donation" to OSU-UML that would require OSU-UML to first transfer money into an account. One of the individuals was Coconspirator 1, an attorney with a law firm in Washington, D.C. The other individual was Coconspirator 2, an individual who communicated via an AOL e-mail address. That initial proposed "donation" was not completed.

45.    In June 2012, **WEB KEOGH** e-mailed Coconspirator 1 and Coconspirator 2 asking about a "path forward" with a transaction. **WEB KEOGH** continued discussions with Coconspirator 1 and Coconspirator 2 about a proposal in which he would transfer $3 million into an account within their control, and after that, he would purportedly receive up to $650 million.

46.    In August 2012, **WEB KEOGH** discussed a different proposal with Coconspirator 1 and Coconspirator 2. On or about August 23, 2012, **WEB KEOGH** e-mailed Coconspirator 2 with a cash flow assessment for OSU-UML. In it, **WEB KEOGH** advised that between September 4, 2012, and September 10, 2012, OSU-UML would have $1.5 million in cash available. **WEB KEOGH** also outlined his cash flow needs, starting with more than $4.3 million needed as of September 10, 2012, and an additional $3.6 million needed by September 17, 2012.

47.    In September 2012, **WEB KEOGH** continued discussions with Coconspirator 1 and Coconspirator 2. **WEB KEOGH** agreed to make two

25

transfers into trust accounts maintained by Coconspirator 1. As a result of a $175,000 transfer, **WEB KEOGH** would purportedly receive $5 million on October 12, 2012. As a result of a $1.5 million transfer, **WEB KEOGH** would purportedly receive $700,000 per month starting October 26, 2012, for 12 months, totaling $8.4 million.

48.    On or about September 9, 2012, **WEB KEOGH** transmitted a letter to Coconspirator 1 "for and on behalf of Keogh Group LLC" requesting $8.4 million in project funding and stated that in "support of initiating this facility, we are ready to wire to your trust account the amount of one million five hundred thousand dollars ($1,500,000.00 USD) on or about September 12, 2012." **WEB KEOGH** indicated the $700,000 project funds would be payable to Keogh Group "for the benefit of its grant/donation" to OSU-UML. The same day, **WEB KEOGH** transmitted to Coconspirator 1 a similar letter requesting $5 million in funding as a result of a $175,000 transfer.

49.    On or about September 10, 2012, **WEB KEOGH** caused OSU-UML to wire $175,000 from OSU-UML's account to a trust account in New York, purportedly maintained by Coconspirator 1.

50.    On or about September 13, 2012, **WEB KEOGH** caused OSU-UML to wire $1.5 million from OSU-UML's account to a trust account in Ohio, based on instructions from Coconspirator 1. **WEB KEOGH** caused a purported invoice to be generated from Keogh Group to OSU-UML for $1.5

26

million in "SWIFT Transfer Fees." On or about September 19, 2012, **WEB KEOGH** e-mailed Coconspirator 1 and Coconspirator 2, authorizing the transfer of $1,500,000 from the Ohio trust account to which it was transferred to an unidentified "bank account designated by you."

51.    **WEB KEOGH** did not inform OSU-UML's Executive Director or the Board of his plans with respect to Coconspirator 1 and Coconspirator 2's transactions. Neither OSU-UML's Executive Director nor its Board approved the wire transfers from OSU-UML.

52.    In October 2012, **WEB KEOGH** contacted Coconspirator 1 and Coconspirator 2 requesting transfers pursuant to the purported agreements. On or about October 30, 2012, **WEB KEOGH** drafted a letter purportedly from Coconspirator 1 to himself (**WEB KEOGH**) and asked Coconspirator 1 to issue the letter to him the following day, to be used with subcontractors. The draft letter stated: "We can confirm that the funds, part of which were derived from payments from your prime contracts with the Federal government, being held and executed through the Trust Account are in excess of $5.5 million and by the end of the next year will exceed $13 million. These funds will be available for you to make payments through your local account(s) to your subcontractors, including but not limited to Commuter Air Technologies, Lawrence Livermore National Laboratory, . . . etc. as early as today 31 October 2012 but no later than 8 November 2012." On or about

November 1, 2012, Coconspirator 1 returned an executed version of the letter to **WEB KEOGH**, who then distributed the letter to OSU-UML's Executive Director and subcontractors.

53.     OSU-UML and the Keogh Group never received any payment from Coconspirator 1 or Coconspirator 2 and were unable to recover the $1,675,000 transferred in September 2012.

## COUNT 12

54.     From in our around June 2011 until in or around early November 2012, in the Western District of Oklahoma and elsewhere,

------------------------------**DANIEL WEBSTER KEOGH and
DANIELLE KEOGH,
a/k/a Danielle Truitt,** ------------------------------

knowingly, intentionally, and with interdependence, combined, conspired, and agreed with each other, and with others known and unknown to the Federal Grand Jury, to commit the offense of wire fraud, in violation of Title 18, United States Code, Section 1343.

### The Object of the Conspiracy

55.     The object of the conspiracy was to divert federal funds intended to pay CAT for wartime defense services and instead to spend those funds on expenses and projects not related to CAT.  More specifically, conspirators routinely failed to pay CAT timely pursuant to the subcontractor agreements, misrepresented to CAT the status of federal government payments to OSU-

UML for JAUDIT work, and failed to disclose to CAT the receipt of funds and diversion of those funds for non-CAT purposes.

**Manner and Means**

56.    The object of the conspiracy was accomplished as follows:

A.    In or around late June 2011, after the federal government inadvertently provided a double payment of approximately $2,164,445.62 to OSU-UML for JAUDIT invoices, **WEB KEOGH** and **DANIELLE KEOGH** directed OSU-UML staff not to refund the money to the federal government and instead to transfer funds to Triton for non-CAT expenses. **WEB KEOGH** and **DANIELLE KEOGH** decided to apply the double payment as credit on later OSU-UML invoices to the federal government.

B.    Through the summer and fall of 2011, as CAT asked about delays in getting paid, **WEB KEOGH** failed to disclose to CAT the double payment and instead suggested that delays were the fault of the government.

C.    In 2011 and 2012, **WEB KEOGH** and **DANIELLE KEOGH** used JAUDIT funds obligated to be paid to CAT—often approximately $1 million each month—to fund Triton's payroll and to pay non-CAT expenses, including expenses related to EMB Energy's battery project and Liberté. Because of the misapplication of government payments, OSU-UML did not have funds available to pay CAT pursuant to its subcontractor agreements.

D.    **WEB KEOGH** and **DANIELLE KEOGH** often directed OSU-

29

UML to issue lulling payments—partial payments of arbitrary amounts on especially old invoices—to ease CAT's concerns about payment delays.

E.   In the summer and fall of 2012, CAT representatives often had difficulty reaching **WEB KEOGH** to check on the status of payments.

F.   In July and August of 2012, **WEB KEOGH** represented to CAT that payment delays were solely related to problems with the federal government, but he did not disclose to CAT that OSU-UML had received— earlier in the summer—JAUDIT payments obligated to be paid to CAT.

G.   In September 2012, after OSU-UML received large JAUDIT payments that had been delayed, **WEB KEOGH**, with the knowledge of **DANIELLE KEOGH**, wired $1,675,000 to accounts identified by Coconspirator 1 and Coconspirator 2, instead of using those funds to pay subcontractors.  **WEB KEOGH** later lulled CAT about the trustees' promise to deliver funds.

**Acts in Furtherance of the Conspiracy**

57.   To effect the object of the conspiracy, **WEB KEOGH** and **DANIELLE KEOGH** committed the following overt acts, among others:

A.   On or about June 28, 2011, **WEB KEOGH** and **DANIELLE KEOGH** directed OSU-UML staff to stop efforts to refund the government for an inadvertent double payment of approximately $2,164,445.62 to OSU-UML for JAUDIT work.

30

B.     On or about June 28, 2011, **WEB KEOGH** and **DANIELLE KEOGH** caused the transfer of approximately $1,104,276.79 from OSU-UML's accounts to Triton's account.  On or about June 30, 2011, **WEB KEOGH** and **DANIELLE KEOGH** caused the transfer of approximately $725,000.00 from Triton's account to EMB Energy's account.

C.     On or about January 24, 2012, **DANIELLE KEOGH** authorized an OSU-UML financial analyst to issue a check from OSU-UML to Triton in the amount of $30,636.02, so that Triton could meet its monthly loan payment to First Pryority Bank.

D.     In early April 2012, OSU-UML owed more than $1 million in overdue JAUDIT payments to CAT.  On or about April 2, 2012, **WEB KEOGH** directed an OSU-UML financial analyst to transfer $50,931.68 to Triton.  On or about April 3, 2012, **DANIELLE KEOGH** and **WEB KEOGH** caused Triton to issue two checks to Erys—one for $35,000, and the other for $15,000.  On or about April 4, 2012, **DANIELLE KEOGH** made a payment of $50,227.99 from Erys to American Express for Liberté purchases of designer clothing inventory.

E.     On or about May 2, 2012, OSU-UML's Controller provided to **WEB KEOGH** and **DANIELLE KEOGH** an updated "cash flow" showing OSU-UML's receipt of $1.2 million in JAUDIT payments and proposed payments to various subcontractors. The Controller proposed paying CAT

31

$838,741.70 for CAT's February 2012 invoice for JAUDIT services. On or about May 2, 2012, **WEB KEOGH** responded by e-mail: "Pay . . . 50% of the CAT February ($420,000)." On the same day, a wire transfer of $420,000 was sent to CAT, and a $100,000 wire transfer was sent to Triton. On or about May 4, 2012, **WEB KEOGH** authorized a $100,000 check from Triton to EMB Energy, with the check's memo indicating it was a short-term loan.

F.    In mid-June 2012, OSU-UML received various SOCOM payments totaling more than $2.8 million—of which more than $720,000 was obligated to CAT. After receiving the payments, **WEB KEOGH** contacted Coconspirator 1 and Coconspirator 2, and he proposed pledging $3 million of OSU-UML funds purportedly in return for up to $650 million in donated funds over five years. **WEB KEOGH** offered to pledge the funds without the permission or knowledge of CAT, OSU-UML's Executive Director, or OSU-UML's Board of Directors.

G.    On or about June 26, 2012, OSU-UML had recorded more than $3 million in accounts payable due to CAT from prior invoices. OSU-UML had already received approximately $1.5 million to pay CAT's invoices from March and April 2012 but not paid CAT. On or about June 26, 2012, OSU-UML had recorded approximately $715,000 in accounts payable due to Triton, based on invoices with payment deadlines of June 29, 2012 ($86,332.83) and July 29, 2012 ($629,193.71). On or about June 28, 2012,

**WEB KEOGH** and **DANIELLE KEOGH** authorized a check from OSU-UML to Triton for $400,055.92. On or about June 29, 2012, **WEB KEOGH** and **DANIELLE KEOGH** authorized a check from Triton to Erys for $119,794.89. The same day, **DANIELLE KEOGH** issued a $122,715.03 check from Erys to the construction company that built Liberté.

H.    By late July 2012, the government was approximately 30 days late in paying OSU-UML's May 2012 JAUDIT invoice. On or about July 24, 2012, **WEB KEOGH** e-mailed CAT stating that all payment delays "are on the government's side at this point." **WEB KEOGH** failed to tell CAT that OSU-UML had received—on May 2, 2012 and June 11, 2012—approximately $1.5 million in JAUDIT funds owed to CAT from prior invoices.

I.    On or about August 20, 2012, a CAT representative e-mailed **WEB KEOGH** to confirm that "slightly more than $3.9M is PAST DUE" to CAT and the payment problem "is a uniquely government administrative action or lack thereof which has resulted in our not being paid." Later that day, **WEB KEOGH** responded by e-mail that "[a]ll of your assertions are accurate" and "we along side of CAT have these unpaid just expenditures." **WEB KEOGH**, however, did not disclose to CAT that OSU-UML had already received—on May 2, 2012 and June 11, 2012—approximately $1.5 million in JAUDIT funds owed to CAT from prior invoices.

J.    On or about September 12, 2012, OSU-UML owed approximately

$3.5 million to CAT when OSU-UML received more than $2 million of JAUDIT funds for CAT. **WEB KEOGH**, though, only transferred partial payments to CAT on the oldest invoices. On or about September 12, 2012, **WEB KEOGH** e-mailed OSU-UML's Controller: "Later today we will lay out the entire payment plan. I would send CAT half of their old invoice (approximately 400 k i think) today, You may tell CAT that we will begin processing other initial payments beginning on Thursday."

K.     On or about September 13, 2012, instead of paying down CAT, **WEB KEOGH** transferred $1.5 million from OSU-UML to an account identified by Coconspirator 1 and Coconspirator 2, purportedly in exchange for several million dollars in return as "donations." **WEB KEOGH** transferred the funds without the permission or knowledge of CAT, OSU-UML's Executive Director, or OSU-UML's Board of Directors.

L.     On or about September 17, 2012, OSU-UML's Controller provided an updated cash flow and proposed to **WEB KEOGH** certain payments to subcontractors. Later that day, **WEB KEOGH** responded by e-mail: "You may process $200,000 of payments of your choosing. Also process a $600,000 payment to Triton tomorrow." In the same e-mail, **WEB KEOGH** directed a Triton employee: "As soon as it is available process the remaining ≈112k balance on the August LLNL invoice via their wire instructions."

M.     On or about September 17, 2012, **WEB KEOGH** caused a wire

34

transfer of $600,204.90 from OSU-UML to Triton. The same day, **WEB KEOGH** caused Triton to issue a check for $600,000 to EMB Energy. Also on September 17, 2012, **WEB KEOGH** caused EMB Energy to issue a check for $112,344.45 to LLNL. On September 18, 2012, EMB Energy issued another check to LLNL, for $260,000. Also on September 18, 2012, **WEB KEOGH** directed an EMB Energy employee to withdraw $227,467.88 from EMB Energy to purchase a cashier's check. The cashier's check was used to pay off three business loans at Bank of Oklahoma, including one loan where **WEB KEOGH** was the borrower.

N.    On or about November 1, 2012, **WEB KEOGH** e-mailed to CAT a signed letter from Coconspirator 1 that **WEB KEOGH** had written and asked Coconspirator 1 to sign. In his e-mail to CAT, **WEB KEOGH** stated: "I have received notification of the status of funds from our Trust account in DC. I have attached a letter from our Trustee to provide validation of the availability of funds. We anticipate the payment to CAT in full on or about 8 November."

O.    When questioned, **WEB KEOGH** and **DANIELLE KEOGH** assured OSU-UML staff that funds from Coconspirator 1 and Coconspirator 2 would be delivered. On or about November 9, 2012, **DANIELLE KEOGH** wrote to OSU-UML's Controller about the funding that **WEB KEOGH** had promised to subcontractors: "Web keeps saying it will get here. If I haven't

35

been taking [sic] with these people myself I would almost think it wasn't real but it is, we are just waiting...."

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 13-20
### (Wire Fraud)

58.    The Federal Grand Jury incorporates paragraphs 1-20 and 38-57 by reference.

59.    OSU-UML owned several bank accounts at RCB Bank in Ponca City, Oklahoma, including its "Indirect Account" ending in xx1211. Triton owned a bank account ending in xx0991 at RCB Bank in Ponca City, Oklahoma. Erys owned a bank account ending in xx1952 at Bank of America in Tampa, Florida. EMB Energy owned a bank account ending in xx1874 at JPMorgan Chase in San Antonio, Texas.

### The Scheme to Defraud

60.    It was part of the scheme to defraud that **WEB KEOGH** and **DANIELLE KEOGH** committed the acts alleged in paragraphs 56-57, which the Federal Grand Jury incorporates by reference.

### The Wirings in Furtherance of the Scheme

### COUNT 13

61.    On or about January 13, 2012, in the Western District of Oklahoma and elsewhere,

36

---------------------------- DANIEL WEBSTER KEOGH, ----------------------------

for the purpose of executing the above-described scheme to defraud in a material manner and to obtain money by means of materially false and fraudulent pretenses, representations, and promises, and with intent to defraud, knowingly transmitted signals by means of wire communications in interstate commerce. In particular, **WEB KEOGH** e-mailed a CAT representative, stating in part: "I'm in DC and will be behind the fence all day. I didn't pick up your voicemail but I assume it's requesting an update. The payments due to us on December 27 still have not arrived. Finance staff is continuing to reach out to that specific dfas element to identify the delay." In reality, OSU-UML had received more than $1 million in JAUDIT payments in early January 2012. On January 4, 2012, **WEB KEOGH** caused OSU-UML to transfer $419,818.49 to CAT to pay down part of a prior CAT invoice, but OSU-UML still owed approximately $1.2 million to CAT for earlier invoices. Instead, **WEB KEOGH** used the remaining JAUDIT funds from January 2012 to pay non-CAT expenses.

All in violation of Title 18, United States Code, Section 1343.

### COUNTS 14-16

62.    On or about the following dates, in the Western District of Oklahoma and elsewhere,

37

-------------------------- **DANIEL WEBSTER KEOGH and**
            **DANIELLE KEOGH,**
                 **a/k/a Danielle Truitt,** ------------------------------------------

for the purpose of executing the above-described scheme to defraud in a

material manner and to obtain money by means of materially false and

fraudulent pretenses, representations, and promises, and with intent to

defraud, knowingly caused signals to be transmitted by means of wire

communications in interstate commerce.  In particular, **WEB KEOGH** and

**DANIELLE KEOGH** caused interstate wires to be transmitted by issuing

the following checks from Triton's account at RCB Bank to Erys's account at

Bank of America:

| Count | Appx. Date of Check | Amount |
|-------|---------------------|--------|
| 14 | April 3, 2012 | $15,000.00 |
| 15 | April 3, 2012 | $35,000.00 |
| 16 | June 29, 2012 | $119,794.89 |

All in violation of Title 18, United States Code, Section 1343.

### COUNTS 17-19

63.    On or about the following dates, in the Western District of

Oklahoma and elsewhere,

-------------------------- **DANIEL WEBSTER KEOGH,** --------------------------

for the purpose of executing the above-described scheme to defraud in a

material manner and to obtain money by means of materially false and

38

fraudulent pretenses, representations, and promises, and with intent to defraud, knowingly caused signals to be transmitted by means of wire communications in interstate commerce. In particular, **WEB KEOGH** caused the following interstate wire transfers to be made:

| Count | Appx. Date | Amount | Sending Bank Account | Receiving Bank Account |
|---|---|---|---|---|
| 17 | May 2, 2012 | $100,000.00 | Triton's RCB Bank account | EMB Energy's Chase account |
| 18 | Sept. 10, 2012 | $175,000.00 | OSU-UML's Indirect Account | Coconspirator 1's "trust" account in New York |
| 19 | Sept. 13, 2012 | $1,500,000.00 | OSU-UML's Indirect Account | Coconspirator 1's "trust" account in Ohio |

All in violation of Title 18, United States Code, Section 1343.

### COUNT 20

64.    On or about October 30, 2012, in the Western District of Oklahoma and elsewhere,

---------------------------- **DANIEL WEBSTER KEOGH,** ----------------------------

for the purpose of executing the above-described scheme to defraud in a material manner and to obtain money by means of materially false and fraudulent pretenses, representations, and promises, and with intent to defraud, knowingly transmitted signals by means of wire communications in interstate commerce. In particular, **WEB KEOGH** prepared a letter purportedly from Coconspirator 1 to himself and sent it to Coconspirator 1 by

39

e-mail, asking Coconspirator 1 to issue the letter to him the following day to be provided to subcontractors.  The draft letter stated that the "trust" accounts held in excess of $5.5 million and would be available to pay subcontractors, including CAT, "as early as today 31 October 2012 but no later than 8 November 2012."

All in violation of Title 18, United States Code, Section 1343.

### COUNTS 21-23
### (Conversion from Organization Receiving Federal Funds)

65.    The Federal Grand Jury incorporates paragraphs 1-20 and 38-64 by reference.

66.    In the one-year period before the dates of the offenses alleged in Counts 21-23, OSU-UML was an organization that received more than $10,000 under a federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance.

67.    On or about the dates set out below, in the Western District of Oklahoma and elsewhere,

-------------------------- **DANIEL WEBSTER KEOGH,** ------------------------------

an agent of OSU-UML, embezzled, obtained by fraud, intentionally misapplied and otherwise without authority knowingly converted to the use of a person not the rightful owner more than $5,000 owned by and under the care, custody, and control of OSU-UML:

40

| Count | Appx. Date | Transaction |
|-------|-----------|-------------|
| 21 | Sept. 10, 2012 | Wire transfer of $175,000 from OSU-UML to "trust" account in New York |
| 22 | Sept. 13, 2012 | Wire transfer of $1,500,000 from OSU-UML to "trust" account in Ohio |
| 23 | Sept. 17, 2012 | Wire transfer of $600,204.90 from OSU-UML to Triton |

All in violation of Title 18, United States Code, Section 666(a)(1)(A).

## FORFEITURE ALLEGATIONS

A.     The allegations contained in this Indictment are hereby re-alleged and incorporated for the purpose of alleging forfeiture.

B.     Upon conviction of any of the offenses alleged in Counts 1-10 and 11-23, **WEB KEOGH** shall forfeit to the United States, any property, real or personal, which represents or is traceable to the gross receipts obtained, directly or indirectly, and any property constituting, or derived from, proceeds the person obtained directly or indirection, as the result of such violations, including but not limited to a money judgment representing the amount of proceeds obtained as a result of the offense.

C.     Upon conviction of any of the offenses alleged in Counts 1, 6-12, and 14-16, **DANIELLE KEOGH** shall forfeit to the United States, any property, real or personal, which represents or is traceable to the gross receipts obtained, directly or indirectly, and any property constituting, or derived from, proceeds the person obtained directly or indirection, as the

41

result of such violations, including but not limited to a money judgment representing the amount of proceeds obtained as a result of the offense.

D.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), **WEB KEOGH** and **DANIELLE KEOGH** shall forfeit substitute property, up to the amount of proceeds obtained as a result of the offenses described in Paragraphs B-C, if, by any act or omission of the defendants, the proceeds obtained as described in Paragraphs B-C, or any portion of that property, cannot be located upon the exercise of due diligence; has been transferred or sold to or deposited with a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be subdivided without difficulty.

All in accordance with Title 18, United States Code, Section 981(a)(1)(C); Title 18, United States Code, Section 982(a)(2)(A); and Title 28, United States Code, Section 2461(c).

A TRUE BILL:

FOREPERSON OF THE GRAND JURY

MARK A. YANCEY
United States Attorney

CHRIS M. STEPHENS
K. McKENZIE ANDERSON
Assistant U.S. Attorneys

42