IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,       )
                                )
    Plaintiff,                  )
                                )
    -vs-                        )   Case No. CR-17-290-D
                                )
DANIEL WEBSTER KEOGH and        )
DANIELLE KEOGH,                 )
a/k/a DANIELLE E. TRUITT,       )
                                )
    Defendants.                 )

* * * * * * *

TRANSCRIPT OF

EXCERPT OF PROCEEDINGS

HAD ON MARCH 9, 2022,

BEFORE THE HONORABLE TIMOTHY D. DeGIUSTI

U.S. DISTRICT JUDGE, PRESIDING

AND A JURY

* * * * * * *

TESTIMONY OF JENNIFER SAIZ

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

CHRISTINA L. CLARK, RPR, CRR
United States Court Reporter
200 N.W. Fourth Street, Suite 5419
Oklahoma City, Oklahoma  73102
christina_clark@okwd.uscourts.gov – ph(405)609-5123

A P P E A R A N C E S

ON BEHALF OF THE GOVERNMENT:

    Mr. Chris Stephens
    Ms. Jessica Perry
    Ms. Elizabeth Joynes
    Assistant United States Attorneys
    U.S. Attorney's Office
    210 West Park Avenue
    Suite 400
    Oklahoma City, Oklahoma 73102


ON BEHALF OF THE DEFENDANT DANIEL KEOGH:

    Mr. Michael J. Edney
    Mr. Galen Kast
    STEPTOE & JOHNSON, LLP
    1330 Connecticut Avenue, NW
    Washington, DC 20036

    Mr. Ashwin J. Ram
    STEPTOE & JOHNSON, LLP
    633 West Fifth Street
    Suite 1900
    Los Angeles, California 90071

    Mr. John J. Byron
    STEPTOE & JOHNSON, LLP
    227 West Monroe
    Suite 4700
    Chicago, Illinois 60603

    Mr. Clifford E. Haines
    HAINES & ASSOCIATES
    The Widener Building, 5th Floor
    1339 Chestnut Street
    Philadelphia, Pennsylvania 19103

    Mr. Edward M. Blau
    BLAU LAW FIRM, PLLC
    101 Park Avenue
    Suite 600
    Oklahoma City, Oklahoma 73102

ON BEHALF OF DEFENDANT DANIELLE KEOGH:

    Ms. Vicki Z. Behenna
    BEHENNA, GOERKE, KRAHL & MEYER
    210 Park Avenue
    3030 Oklahoma Tower
    Oklahoma City, Oklahoma 73102

**I N D E X**

**PAGE**

EVIDENCE ON BEHALF OF THE GOVERNMENT:

JENNIFER SAIZ
        Direct Examination by Ms. Perry . . . . . . . .05
        Cross-Examination by Mr. Edney . . . . . . . . 50
        Cross-Examination by Ms. Behenna . . . . . . 103
        Redirect Examination by Ms. Perry . . . . . .104

CERTIFICATE OF REPORTER . . . . . . . . . . . . . . 110

CHRISTINA L. CLARK, RPR, CRR
United States Court Reporter
200 N.W. Fourth Street, Suite 5419
Oklahoma City, Oklahoma  73102
christina_clark@okwd.uscourts.gov – ph(405)609-5123

**P R O C E E D I N G S**

(The following is an excerpt of the proceedings had on March 9, 2022, containing the testimony of Jennifer Saiz:)

THE COURT: Government, call your next witness, please.

MS. PERRY: The United States calls Jennifer Saiz.

THE COURT: Ms. Saiz, please come forward, stand in front of the witness chair and be sworn.

THE CLERK: Please raise your right hand.

(The witness was duly sworn.)

THE CLERK: Please be seated.

THE COURT: Ma'am, you can remove your mask while you're testifying.

THE WITNESS: Thank you.

**JENNIFER SAIZ**,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

**DIRECT EXAMINATION**

BY MS. PERRY

Q Good morning. Could you please introduce yourself for the jury.

A Good morning. I'm Jennifer Saiz.

Q Ms. Saiz, in the 2010-to-2012 time period, did you go by a different name?

A That was my married name, Jennifer Johnson.

Q    Ms. Saiz, where are you from?

A    Originally, I'm from Clovis, New Mexico.

Q    Have you been in Oklahoma for a while?

A    Yeah.  Since 1994.

          THE COURT:  Ma'am, could you move just a little closer to the microphone and kind of pull it a little closer to you, please.

Q    (By Ms. Perry) Can you tell us about your educational background.

A    Yes.  I graduated from the University of Oklahoma with a bachelor's degree in business administration with emphasis in accounting.

Q    Can you briefly summarize your work experience, especially as it relates to government contracting and accounting?

A    Currently, I have been over 23 years in accounting and government contracting.

Q    Are you employed now?

A    I own my own business.

Q    And is that a business involving government contracting?

A    It is.  I do contracts management and subcontracts management for small and medium-sized businesses.

Q    Are you familiar with a company known as Commuter Air Technologies, or CAT?

A    Yes.  That's a previous employer of mine.

*DIRECT EXAMINATION OF JENNIFER SAIZ*

Q   Okay.  And when did you work for CAT?

A   Between 2009 to 2016.

Q   What positions did you hold at CAT?

A   I started as the controller in 2009, and then I was promoted to vice president of finance and then eventually became the senior vice president of business services.

Q   And where was CAT located?

A   In Oklahoma City.

Q   When you -- when you started with CAT in 2009, about how many employees did it have?

A   I was the seventh employee.

Q   And over your time with the company, did it grow?

A   Definitely.

Q   Okay.  And how big did it get?

A   When I left in 2016, we had over 100 -- I would say 125 employees.

Q   During your time working for CAT, did it have a relationship with the OSU University Multispectral Laboratory?

A   Yes.

Q   And do you know that as the UML?

A   UML, uh-huh.

Q   How did that relationship with the UML come about?

A   They became a prime contractor to one of -- we were a subcontractor to one of their prime contracts.  Basically, Commuter Air Technology identified some work for the

government, and they had a vehicle -- contract vehicle that the scope of work fit.  So we worked a relationship with them, and that was how we became involved with that business.

Q    Okay.  Do you remember when CAT started a relationship with the UML?

A    That was the end of 2010.

Q    And did CAT work -- work with UML under a series of subcontracts?

A    Yes.

Q    Do you remember how many there were?

A    There were a total of three subcontracts, but one subcontract had two delivery orders.  So, technically speaking, it was four mini contracts.

Q    Okay.  And are you familiar with what's known as the 1903 contract?

A    Yes.

Q    And are you also familiar with the 0004 contract?

A    Well, CAT's contracts were a little bit different, so we had 1903 and 2011, which I think was equivalent to the 0004 for UML.

Q    Okay.  Was the work called for under those contracts substantially the same?

A    Yes.

Q    Were they just consecutive contracts in terms of their time period?

A    For the most part.  I mean, the early-on subcontracts were really -- there was a deployment phase, a services phase, and then there was also the integration and ferrying the aircrafts over.

Q    Did each contract -- or subcontract have a Statement of Work?

A    That's correct.

Q    And, in general, what did that call for CAT to do?

A    Well, Commuter Air provided Intelligence Surveillance Reconnaissance, ISR services.  So, basically, what we would do is provide the operations; we would do flyovers, collect data, and then report it back to the people that needed to have that information.

Q    Okay.  And what was UML's role in terms of the work being performed for the government?

A    They were basically the prime contractor.  So a majority of the time it would be from a project management stance, and that would -- that was it.  There was really -- CAT performed a majority of the work on all four of those subcontracts.

Q    And what was -- what was your role with respect to the contracts that CAT had with the UML?

A    My role at that time, I was the vice president of finance, so I handled all of the back office services support. So I handled all of the contract management, subcontract management, all of the accounting, the payroll, the human

*DIRECT EXAMINATION OF JENNIFER SAIZ*

resources.

So specifically with this contract, I made sure that all of the government billings were submitted on a timely basis and that any kind of cash flow needs, et cetera, were taken into consideration, and any contractual reporting requirements that were needed for us to submit to the prime contractor for the prime contractor to submit to the government.

Q    Okay.  So when it came time for CAT to invoice the UML, you were part of that process; correct?

A    That's correct.

Q    And if you could -- there's some notebooks to the side of you or you're also welcome to look at the screen in front of you.

MS. PERRY:  Karen, if you could pull up Government's Exhibit 237.

Q    (By Ms. Perry) Is this an example of an invoice that Commuter Air Technologies would send to the UML?

A    That is the single cover page immediately out of the accounting system, but the invoice was actually much more required to submit.  But this was the very top cover page that had to go with every invoice.

Q    Okay.

MS. PERRY:  Karen, if you could pull up 237.2.

Q    (By Ms. Perry) Is this a second page of what was submitted to the UML?

A    That is correct.

Q    Okay.  And is that your signature at the bottom of these invoices?

A    That is correct.

MS. PERRY:  Karen, if you could highlight the top portion.

Q    (By Ms. Perry) Is this an invoice for services in January of 2012?

A    That is correct.

Q    Okay.

MS. PERRY:  Karen, if you could scroll out and give us the top half of that page.

Q    (By Ms. Perry) So in this time period, about how many hours did CAT personnel perform in support of this contract?

A    For this month, it was 4,339.

Q    And was that pretty consistent over time?

A    For the most part, the invoices didn't waiver very much month over month.

Q    And it was part of your job to make sure that these invoices were submitted properly and on time to the UML; is that correct?

A    That is correct.

Q    And did CAT meet its obligations in that regard?

A    Yes.  Every month.

MS. PERRY:  Karen, if you could pull up what's

previously been admitted as Government's Exhibit 209.

Q    (By Ms. Perry) Do you recognize this document?

A    Yes.

Q    Is this the subcontract agreement between UML and CAT under the 1903 subcontract?

A    Yes.  This is the cover page.

MS. PERRY:  Karen, if you could pull up page 209.2. And if you could highlight the bottom portion of this page that says "Payment."

Q    (By Ms. Perry) Does this subcontract designate when the UML is supposed to pay CAT pursuant to its -- once CAT submits an invoice?

A    Yes, it does.

Q    Okay.  And what -- under this 1903 contract, what was the payment term?

A    It says the buyer shall pay the invoice within 45 days after the proper invoice -- after the receipt of the proper invoice.

MS. PERRY:  Karen, if you could pull up what's previously been admitted as Government's Exhibit 219.

Q    (By Ms. Perry) Do you recognize this document?

A    This is the 2011 CAT subcontract cover page.

MS. PERRY:  And, Karen, if you could pull up 219.2 and highlight the bottom half of that page.

Q    (By Ms. Perry) So in this 2011 subcontract, what was the

*DIRECT EXAMINATION OF JENNIFER SAIZ*

payment term here?

A    This payment term says that the payment would be made 30 days after the buyer receives payment from the customer.

Q    So was it your understanding, pursuant to this subcontract, that if UML received a payment from the federal government, it should remit payment to CAT within 30 days?

A    Within 30 days of receiving payment from the government customer, that's correct.  We use that term as "pay when paid."

Q    And would that include if the UML received partial payments from the government?

A    That is correct.

Q    So between the 1903 subcontract and the 2011 subcontract between CAT and the UML, the payment terms changed; is that right?

A    That is correct.

Q    And in the second contract, CAT wasn't to be paid -- wasn't required to be paid until 30 days after the UML received money from the government; right?

A    Within 30 days.

Q    Did that change at all how you handled your accounting system internally?

A    It did not.  I mean, we just watched everything the same way, and if things seemed to be being delayed, we would still follow up because we don't have privy to the information of

when the customer pays the prime contractor.

Q    So if the government paid the UML, you wouldn't -- CAT wouldn't know that unless UML told you; is that right?

A    That's correct.

Q    But you would have to have some tickler or way to sort of monitor when your payments are coming in so that you can inquire with the UML if you're not getting payments.  Is that fair?

A    Right.  Typically, my staff would wait, and if anything went beyond 30 days from the date of invoice, we put it on a -- kind of on a listing.  And then within 15 more days we would start sending out the request.

And specifically with UML, all the way through all three contracts, consistently, we had a weekly aged receivables report that would go to them.  And it was between my staff and the actual accounts payable staff at UML.

Q    I'd like to talk about the 1903 contract.

At some point under that contract did UML start getting behind on payments to CAT?

A    1903, yes.

Q    Okay.  Do you remember when that happened?

A    There's so many contracts here.  I want to say initially, if I remember right, it would have been 2011, maybe April of 2011 timeline.

Q    Under that 1903 contract, when UML got behind on

payments, what did you do?

A    Initially, my staff was reaching out to the UML payables. And then once it got above a certain limit, then I stepped in trying to reach out and speak to them directly, trying to get resolution.

And then once it hit, if I remember correctly, 2. -- a little over $2 million -- $2.1, almost $2.2 million, that's when I engaged Acorn Growth Companies, which was the private equity firm and my functional boss, the CFO of Acorn, Jeff Morton, to get him involved.  My boss, Darryl Wilkerson, at the time was engaged once it got to me for the first round.

Q    You said you reached out to UML.  Do you remember who you contacted?

A    Initially, on the 1903 contract -- and, again, the timing, it's been a while, but I do know that Danielle was initially one of the people that was spoken to, and then they switched people.

The contracts manager or the director of contracts, his name was Gary Gallagher.  And eventually they had me reach out and talk to Web Keogh.

Q    Okay.  And what was your understanding as to why there was a payment delay under the 1903 contract?

A    Initially, there was never an explanation given.  It's just that it was an issue with -- that they were trying to get resolved and that they would keep us notified of what was

going on.

Q    At some point did you get any further explanation as to what was happening?

A    Yeah.  When the operations group came into play, the VP of operations, Gary Ambrose, reached out to their operations. And they responded back that it was an issue with DCAA, Defense Contract Audit Agency.

Q    Did they give you an idea of exactly what the problem was with DCAA?

A    No.

MS. PERRY:  Karen, if you could pull up Government's Exhibit 223.

Q    (By Ms. Perry) Is this an e-mail chain you are copied on around September 26th of 2011?

A    Yes.

MS. PERRY:  Karen, if you could go to 223.2 at the bottom.

Q    (By Ms. Perry) Is this an e-mail from Gary Ambrose that you're copied on to Web Keogh?

A    That's correct.

Q    Does he say:  "I understand that UML is being held up from DCAA for payments"?

A    That's correct.

Q    And is that consistent with your recollection at the time of what CAT was being told?

A     That's correct.

Q     Okay.

MS. PERRY:  Karen, if you could go to the top of this page.

Q     (By Ms. Perry) That same day, does Gary Ambrose e-mail, copying you, Web Keogh, and now with Tim Reynolds, and say: "Good morning, Tim.  I got an out-of-the-office reply from Web that says he is out through October 3rd.  We need to resolve the payment issue immediately.  As you know, our cash flow affects our ability to operate."

He goes on to say:  "Jennifer was previously directed to Web as the only person" -- "as the only person that could discuss.  Waiting until October is not going to work."

Do you remember that?

A     I do.

Q     Do you remember who told you that Web Keogh was the only person you should talk to?

A     Not specifically, I don't.  I just know at a certain point, when the amounts got to that level of being past due, that that's who I was directed to communicate with.

And Gary, from the operations side, was also trying to assist before Darryl Wilkerson actually stepped in with Acorn.

MS. PERRY:  Karen, if you could go back to the first page of this exhibit and highlight the bottom.

Q     (By Ms. Perry) Does Web Keogh respond that same day:

*DIRECT EXAMINATION OF JENNIFER SAIZ*

"I'm out of the office, but I'm still working this very issue as it is affecting not just you but us as well."

Do you recall that?

A    That's correct.

Q    Okay.

MS. PERRY:  Karen, if you could blow up the top half of this e-mail.

Q    (By Ms. Perry) Did you write back to Mr. Keogh that day?

A    Yes.

Q    And what did you say?

A    Basically, offering options of possible partial resolution for anything that was disputed, and also wanting confirmation that nothing Commuter Air Technology had submitted was an issue.

Q    You wanted to make sure, if there was a payment delay, it wasn't CAT's fault; is that right?

A    That's correct.

Q    Do you ever recall the UML mentioning a double payment from the government?

A    No.

Q    If the government had received a double -- if the government had sent a double payment to the UML covering some of these past-due invoices, did anyone from the UML disclose that there might be money available to pay you?

A    Not that I can recall.  I mean, I do know that they

communicated to us.  They were working on the payments, there were issues with the payments, but initially there was really no details or additional information provided from UML financially to me or contractually to me.

Finding out about the DCAA issue was through what -- operations was talking to operations, which was from the UML operations to the Commuter Air operations.

So I offered numerous times, with my experience and my background, to assist in helping to resolve any issues, but it was always the response of we're working on it, we're trying to get it resolved, and trying to get you guys paid as quickly as possible.

MS. PERRY:  Karen, if you could pull up Government's Exhibit 233.  If you could blow up the top half of this e-mail.

Q    (By Ms. Perry) Is this an e-mail that you were copied on from Jeff Davis to Web Keogh?

A    Yes.

MS. PERRY:  Karen, if you could -- actually, you're fine.

Q    (By Ms. Perry) Does Mr. Davis write to Mr. Keogh:  "You are correct that the purpose of the call was to express my deep concern about the status of UML's account with CAT"?

Was there deep concern around this time about past-due payments --

*DIRECT EXAMINATION OF JENNIFER SAIZ*

A    Yes.

Q    -- from the UML?

He goes on to say:  "As of January 14th, UML will be past due on $2.1 million to CAT.  While CAT is resourceful, this is a continuing issue that causes us to incur extraordinary costs and measures to deal with this large shortfall."

Can you give us an idea of what impact the delayed payments were having on CAT?

A    Sure.  CAT -- this was one of CAT's largest contracts.  And we had a line of credit with our banking institutions, and the government contract receivables were part of our borrowing base.  And the borrowing base is basically reflective of what we are capable of borrowing against the line of credit.

As those receivables become past due, they are no longer able to be included in the borrowing base.  So, therefore, the amount of borrowing power you have is reduced.

So, in this instance, you know, it was $2.1 million that they owed us.  I don't believe all that was past due, and I think there was still another $800- or $900,000 that was current.

So, in totality, at that timeline, it was about $3 million in receivables, but we could only use $800,000 to the borrowing base.  So that's the impact it had on us from a cash flow perspective, from a liability perspective to the bank, and also we were spending a large amount of money on

*DIRECT EXAMINATION OF JENNIFER SAIZ*

daily operations.

Q    So, in other words, it was jeopardizing CAT's relationship with its banker; is that right?

A    Correct.

Q    Mr. Davis goes on to say:  "I would like to request that you and your team meet with us in Oklahoma City early next week."

He further says:  "CAT should not be left to bear this expense and essentially serve as the banker for this project. I will be in Europe next week and unable to attend the meeting.  However, Jeff Morton, Jennifer Johnson, and Rick Nagel will be available."

Did you attempt to schedule a meeting in January of 2012 with Mr. Keogh?

A    We did.

Q    Okay.

MS. PERRY:  Karen, if you could pull up Government's Exhibit 234.  If you could highlight the bottom portion, Karen.

Q    (By Ms. Perry) Does this appear to be an e-mail from Mr. Keogh's executive assistant attempting to set up a meeting on Friday, January 20th --

A    That's correct.

Q    -- of 2012?

A    That's correct.

*DIRECT EXAMINATION OF JENNIFER SAIZ*

MS. PERRY:  And, Karen, if you could go to the top half.

Q   (By Ms. Perry) Does Mr. Davis respond:  "I have requested that the meeting be in Oklahoma City.  Given that over $2.1 million is owed to CAT by UML, I believe that an Oklahoma City meeting location is appropriate"?

A    That's correct.

Q    And did you all end up having a meeting in Oklahoma City around January 20th of 2012?

A    Jeff Morton, myself, and Web did meet.

Q    Okay.  What do you recall about that meeting?

A    Again, pretty much the same conversation.  There was no resolution.  It was just there's payment issues, we're working on it.  There was a promise to come up with a payment plan during that meeting as well.  And that was pretty much it.

I mean, we explained, on our end, the importance and the needs of why we're asking for the updates and the issues that it was causing on the line of credits and the continued operational support.

Q    Did Mr. Keogh explain at that meeting why payments were delayed?

A    No.  Not in detail.

Q    Were you led to believe at that meeting that it was a delay on the government's side rather than UML?

MR. EDNEY:  Objection --

THE WITNESS:  Correct.

MR. EDNEY:  -- your Honor.  Counsel is blatantly leading the witness.

THE COURT:  So the objection is leading?

MR. EDNEY:  Yes, your Honor.

THE COURT:  That objection is sustained.

MR. EDNEY:  Thank you.

Q    (By Ms. Perry) Do you recall anything else that Mr. Keogh said in that January meeting?

A    Just that they were going to get the payment plan and have that in place for us to be able to communicate to the banks.

Q    As of this January 2012 meeting, what was your understanding at that point as to the cause of the payment delays?

A    From the previous e-mails was just the DCAA.  I don't recall any further discussions before those meetings of giving any more detail from any of the UML staff.

THE COURT:  Counsel, let me interrupt you.

Ladies and gentlemen, it's about three minutes after 11:00.  It's probably a good time to have our morning comfort break.  Please be prepared to come back in at 11:25.  That's almost 20 minutes.  With that, you may go.

Please remain seated while the jury departs.

(The jury exited the courtroom.)

THE COURT:  The jury has departed.

We'll be in recess until 11:25.

(A short recess was taken.)

THE COURT:  Counsel, please proceed.

Q    (By Ms. Perry) Ms. Saiz, just before the break we were talking about the January 20, 2012, meeting you had with Mr. Keogh; is that correct?

A    Yes.

MS. PERRY:  Karen, if you could pull up Government's Exhibit No. 201.

Q    (By Ms. Perry) Ms. Saiz, this is a timeline that the jury has seen previously.

MS. PERRY:  Karen, if you could blow up the key in the bottom left-hand corner.

MR. EDNEY:  Your Honor, may we approach for a moment?

THE COURT:  Certainly.

(The following proceedings were had at the bench outside the hearing of the jury:)

MR. EDNEY:  Your Honor, I don't know if it's some technical snafu, but what just got posted on that screen is not 201.  It has the -- up at the top it has those things that you didn't want in, the quotes from the e-mails and the events.

THE COURT:  It's not still up there, is it?

*DIRECT EXAMINATION OF JENNIFER SAIZ*

MR. STEPHENS:  No.  So, Judge, what happened -- I'm sorry.

MS. PERRY:  No.  As soon as it popped up on the screen, I made eye contact with Ms. Hadrava and she realized she put up the wrong version.  We will be sure to put up the correct version.  That was an inadvertent mistake.

THE COURT:  All right.  Well, you need to take steps to make sure that doesn't happen again.  It was only up there for a couple of seconds.

MR. EDNEY:  Yeah.  I was lucky to be looking at it, but, yeah.

THE COURT:  All right.  Thank you.

MR. EDNEY:  All right.  Thanks.

(The following proceedings were had in open court:)

THE COURT:  Proceed.

MS. PERRY:  If you could pull up Government's Exhibit 201 and highlight the key in the bottom left-hand corner.

Q    (By Ms. Perry) Ms. Saiz, on this document do you see that the green arrows represent DoD payments to UML and the orange represents UML payments to CAT?

A    Yes.

MS. PERRY:  Karen, if you could back out again.  And if you could blow up the timeline with the dates in the August, October, November flights, please.

*DIRECT EXAMINATION OF JENNIFER SAIZ*

Sorry.  Can you capture the dates as well?

Q    (By Ms. Perry) Ms. Saiz, at the time of the January 20, 2012, meeting with Mr. Keogh -- and I'm going to mark that on the screen, if that's okay (indicated).

On the timeline, does my line appear to be about when the January 20th meeting would have occurred?

A    That's correct.

Q    At that time -- or at that meeting, did Mr. Keogh disclose to you and your colleagues --

MR. EDNEY:  I'm going to object to this question, your Honor.  I'd like to be heard at side bar on it.

THE COURT:  Okay.

(The following proceedings were had at the bench outside the hearing of the jury:)

THE COURT:  Yes, sir.

MR. EDNEY:  Your Honor, we just heard government elicit testimony from this witness that she had absolutely no idea when government payments were coming in.  Counsel has not laid the proper foundation to question this witness about this chart.

She does not have the requisite factual background to opine on it or give any pertinent testimony regarding it. I understand that counsel has been able to use this chart with several witnesses, and I believe in some of those cases that counsel has laid the -- a foundation for eliciting their

personal knowledge about the data points in this chart.

But with this witness, given her government-elicited testimony on the point, the use of this chart is improper, and we object to it.

THE COURT:  Well, I think where counsel is going is that this witness attended a meeting at which Mr. Keogh was present to talk about delayed payments, and I think she's going to use the chart to ask whether anything was said at the meeting about payments that are reflected in the chart.  I don't see anything wrong with that.

And -- unless you're going to go somewhere else with these questions, counsel.

MS. PERRY:  No, your Honor.  I intend to ask her whether or not the payments were disclosed and to use the chart in the exact same way Mr. Ram did with prior witnesses.

MR. EDNEY:  Well, your Honor, on that point, that creates a whole different layer of problems, because we just heard testimony from this witness that she had a very poor recollection of the events of that meeting, that she doesn't remember the details of what was said and not said.

THE COURT:  I don't recall that testimony.

MS. PERRY:  I don't recall that either, your Honor.  She recalls the meeting.  She recalled that Mr. Keogh said that he would provide a payment plan.  She does, in fact, recall that meeting.

THE COURT:  That's what I remember her saying, so the objection is overruled.

Let's get going, people.

(The following proceedings were had in open court:)

THE COURT:  The objection is overruled.

Please proceed.

Q    (By Ms. Perry) Ms. Saiz, at that January 20, 2012, meeting, did Mr. Keogh disclose to you and your colleagues that the UML had received payments on the August and September 2011 flights, on the October 2011 flights, and on the November 2011 flights prior to that meeting?

A    No, they did not.

MS. PERRY:  Karen, if you could pull up what's previously been admitted as Government's Exhibit No. 240.

Q    (By Ms. Perry) Ms. Saiz, is this an e-mail exchange between you and Mr. Keogh on February 16th of 2012?

A    Yes.

MS. PERRY:  Karen, if you could pull up the bottom e-mail.

Q    (By Ms. Perry) What did you write to Mr. Keogh?

A    I was asking if he was still going to be calling that day and -- because I needed to give the banks an explanation why the previous promise to pay didn't happen on the 10th.

Q    What do you remember about a payment on the 10th?

A    After the meeting that we had with Jeff Morton and Web,

*DIRECT EXAMINATION OF JENNIFER SAIZ*

there was a payment plan, basically, that was provided.  And they gave us certain dates that they were going to send us payments.  And that was one of those dates.

MS. PERRY:  Karen, if you could blow up the top e-mail, please.

Q    (By Ms. Perry) And did Mr. Keogh respond to you?

A    Yes.

Q    What did he tell you?

A    He said basically that a couple of the invoices were running late, a week or so, and that they would have 25 percent of the last payment and they're just waiting on DFAS for the rest of the invoices to clear.

MS. PERRY:  Karen, could you pull up Government's Exhibit 201, please.  And if you could highlight with the timeline at the top down through the January 2012 flights, please.

Q    (By Ms. Perry) Ms. Saiz, I'm going to mark on your screen a line on about February 16th, the date of this e-mail.

Does the line I drew appear to be on about February 16th of 2012?

A    Yes.

Q    Okay.  As of that date, had Mr. Keogh disclosed that the UML had already received payments for the November 2011 flights and the December 2011 flights?

A    No, they had not.

*DIRECT EXAMINATION OF JENNIFER SAIZ*

Q    At some point did the UML --

         MS. PERRY:  I'll remove this, your Honor.

     Karen, you can pull down that exhibit.

Q    (By Ms. Perry) At some point did the UML get up to date in the first part of 2012?

A    Yes.  They did finally catch all the payments up.

Q    Did the UML always pay CAT invoices with full payments for the full amount of the invoice?

A    No.

Q    How did they often pay?

A    There were -- there were several partial payments made to CAT.

Q    Was that common in your experience?

A    Not in my government contracting experience.

Q    What do you typically see?

A    I mean, typically, if you've got an approved invoice and it's accurate, you're paid the full invoice.

Q    During these payment delays in early -- late 2011, early 2012, did CAT ever consider going to SOCOM to talk about the delayed payments?

A    Numerous times, yes.

Q    And did CAT talk to SOCOM?

A    No.

Q    Why not?

A    At that -- at that time, it was wanting to hold on to the

*DIRECT EXAMINATION OF JENNIFER SAIZ*

relationship and not ruin any business relationship with any -- any of the parties, and so we kept on trying to work through OSU-UML.

Q    After the UML got caught up in payments in early 2011, did they stay current on payments to CAT?

A    Not for very long.

Q    Do you remember when they got behind again?

A    I want to say probably June or July.  A few months later.

Q    Do you remember which subcontract was in effect at that point in time?

A    That would have been the 2011 contract -- subcontract.

Q    When UML got behind again, did you reach out to anyone at UML?

A    At that time Jennifer Cowan was who our direct contact was.  So I had an accounts receivable -- government accounting receivable lady that worked for me named Christy Morris, and she did the weekly communications with Jennifer Cowan.

And then my accounting manager, Christy Jameson, was also engaged.  And then when they got behind again, I got immediately involved.

Q    Did you have any contact with Mr. Keogh around that time?

A    Yeah.  It would have been both Jennifer Cowan and Web.

Q    What did you understand was the reason for delayed payments at that point in time?

MR. EDNEY:  Objection.  Lack of foundation.

THE COURT:  Sustained.

Q    (By Ms. Perry) Ms. Saiz, I believe you previously testified that after the UML got caught up, they got behind again; is that right?

A    That's correct.

MR. EDNEY:  Objection.  Leading.

THE COURT:  Overruled.  She's just orienting the witness on the line of questioning.

Proceed.

Q    (By Ms. Perry) When the UML got behind on payments again, did you talk to anyone at UML?

A    Jennifer Cowan and Web Keogh.

Q    Were you provided with an explanation as to why payments were delayed to CAT?

MR. EDNEY:  Objection, your Honor.  Calls for hearsay.

THE COURT:  Sustained as to communications with Ms. Cowan.  Overruled with respect to Mr. Keogh.

Q    (By Ms. Perry) Did Mr. Keogh tell you why UML payments were delayed to CAT?

A    No specific reason, no.

Q    Do you remember having any conversations with Danielle Keogh during that time period?

A    Not that I can recall.

Q    Okay.  Let's look at what's been previously admitted as

Government's Exhibit No. 271.

MS. PERRY:  Karen, if you could blow that up.

Q     (By Ms. Perry) Is this an e-mail you're copied on from Darryl Wilkerson to Web Keogh, Ken Viera, and Tim Reynolds?

A     Yes, that's correct.

Q     Was Mr. Wilkerson e-mailing Mr. Keogh and others at the UML regarding past-due invoices from CAT to the UML?

A     Yes.  That's correct.

Q     And does he say:  "I understand that the OSU-UML is our prime contractor and each of you individually have been and are working diligently to resolve the problems associated with getting the account current.  I have seen the e-mail traffic between DFAS, UML, and USSOCOM on the matter and, therefore, believe this to be true"?

Do you remember what explanation was provided at this point in time regarding delayed payments?

A     If I remember correctly, the -- Jennifer Cowan had shared an e-mail with a DFAS representative that there was an issue with the modification --

MR. EDNEY:  Objection, your Honor.  The witness is now providing hearsay testimony.

THE COURT:  Overruled.

Proceed.

THE WITNESS:  That the modification was an issue with getting it issued to the contract.

*DIRECT EXAMINATION OF JENNIFER SAIZ*

Q     (By Ms. Perry) What do you mean by "modification"?

A     For the funding.  The funding modification.

Q     And at the bottom of the email, Mr. Wilkerson says:  "I respectfully submit if the above is true, I would like to have confirmation from UML that this is an accurate depiction of where we were.  Then we have a legitimate claim under the Prompt Payment Act."

Do you see that?

A     That's correct.

Q     Can you help us understand his reference to the Prompt Payment Act?

A     Yes.  Basically, as a subcontractor, if you're not being paid timely, you have the option to utilize the Prompt Payment Act to submit and request interest and penalties for failure of timely payment, especially for small businesses.

Q     Was that something that CAT was considering at this point in time?

A     Yes, it was.

Q     What would CAT have needed in order to make a claim under the Prompt Payment Act?

A     We just had to do a letter, and the letter had to be sent to the prime contractor.  And, basically, you have to do a listing of all the invoices, the original invoice dates, the due dates, and then do an interest calculation and a penalty calculation in accordance with the regulation -- with the FAR

regulation.

Q    Okay.

MS. PERRY:  Karen, if you could pull up 271.3.

Q    (By Ms. Perry) At the bottom of this page, can you see the e-mail below that we just looked at from Mr. Wilkerson?

MS. PERRY:  Karen, if you could blow up the top half.

Q    (By Ms. Perry) Did Mr. Keogh respond to that e-mail on August 20th of 2012?

A    He did.

Q    And what did he say?

A    He said basically all of the things Darryl said was correct, and he said that they had not considered the Prompt Payment solution and that they would cover or support CAT in that.  And then he copied Jennifer Cowan as well so she could initiate paperwork.

MS. PERRY:  Karen, if you could pull up Government's Exhibit 201.

Q    (By Ms. Perry) Ms. Saiz, I'm going to mark on this timeline about the date of this August 20, 2021 [sic] e-mail.

Does the red line I just drew on your screen appear to be about August 20, 2012?  I'm sorry.

A    Yes.

Q    As of the date of this e-mail from Mr. Keogh, had he disclosed that the UML had received a significant payment from

the government on June 12, 2012?

A    No, they did not.

Q    Did he disclose that UML had also received a payment on the March 2012 flights?

A    No, he did not.

MS. PERRY:  Karen, can you pull up unobjected-to Government's Exhibit 274.

Q    (By Ms. Perry) Do you recognize this document?

A    Yes.

Q    What is it?

A    This is the letter for us seeking the Prompt Payment clause.

Q    And is this something that you helped prepare on behalf of CAT?

A    Yes.  My contracts manager, Kathy Marsh, prepared it.  I finalized and reviewed it, and then Mr. Wilkerson signed off on it.

MS. PERRY:  Karen, if you could blow up the second full paragraph of this letter.

Q    (By Ms. Perry) In this letter, does it state:  "CAT is a small business in which this delinquency impacts our cash flow significantly causing undue hardships to our organization"?

A    That is correct.

Q    What sorts of hardships were being caused to CAT at this point in time?

*DIRECT EXAMINATION OF JENNIFER SAIZ*

A    The significant cash flow delays and, again, the impact on the borrowing base.  The bank had become lenient on that first go, but the second time the invoices started to be late they did not -- they were not lenient on the borrowing base for the line of credit.

Q    Who did CAT send this letter to?

A    To Richard Shultheis, who was the contracts liaison at UML at the time -- OSU-UML at the time.

Q    Did CAT send this letter to anyone else?

A    I believe that the -- the (unintelligible) says that it's supposed to be sent to the prime contractor and courtesy copying the contracting officer.

Q    Do you remember if the contracting officer was courtesy copied on this correspondence?

A    I don't recall.

Q    At some point did CAT become aware that UML had received additional payments from the government?

A    Only after we submitted this letter were we aware that they had received payments.

Q    Okay.  How did you learn about additional payments?

A    Honestly, I can't remember specifically who we were informed by, but I know that there was the discussions back and forth.  I do know that the contracting officer and -- I can't recall if it was Mr. Shultheis that was speaking with my contracts manager, Kathy Marsh, but at some point in time I --

we were informed that the payments had been made.

MS. PERRY:  Karen, can you pull up unobjected-to Government's Exhibit 295.

Q    (By Ms. Perry) Does this appear to be an e-mail chain around October 30, 2012, that you're copied on?

A    That is correct.

MS. PERRY:  Karen, if you could blow up the bottom e-mail -- I'm sorry, if you could pull up page 295.2 and blow up the bottom half.

Q    (By Ms. Perry) Is this an e-mail from you on October 25th of 2012?

A    Yes.

Q    Okay.  Tell us what's happening here.

A    I was asking Jennifer Cowan if they were going to be sending a check instead of a wire.

Q    And why were you asking that?

A    Because previously they had said they were going to send a wire.

Q    Okay.  How did UML normally remit payments to CAT?

A    Oh, always through the ACH wire.

Q    And if you -- I'm not going to change screens, but --

MS. PERRY:  Well, actually, Karen, if you could pull up 295.1, the very bottom.  Just the very bottom caption.

Q    (By Ms. Perry) Did someone respond to your e-mail?

A    I can't tell from what's on the screen.

Q    Well, this is just the caption.  I'm going to show you the body in just a second.

A    Oh.

Q    But did Jennifer Cowan respond to you?

A    Yes.  Yes.

MS. PERRY:  Karen, if you could pull up the top of 295.2.

Q    (By Ms. Perry) What did you understand the reason was for a check instead of a wire?

A    Basically, she's saying when they transferred the funds it was just a more efficient means for the final payment.

Q    Did that make sense to you?

A    No.

Q    Why?

A    Again, they've always paid through the wire ACH.

MS. PERRY:  Karen, could you go back to 295.1.  If you could blow up the top half of that page, including the e-mail below that, that will make this faster.

Q    (By Ms. Perry) Did you respond again on October 30th of 2012?

A    Yes.

Q    What did you say?

A    Just asking again why they still had not made a payment. We had not yet received the check or a wire transfer at this point in time.

*DIRECT EXAMINATION OF JENNIFER SAIZ*

Q    And did Mr. Keogh respond to you?

A    Yes.

Q    What did he tell you?

A    He represented that he told Jennifer Cowan to hold the check for CAT because they had a new trust account and that's where the funds were going to be sent from.

Q    Had you ever encountered anything like this in your years of government service, where funding was -- had to be routed through a trust account?

A    No.

            MR. EDNEY:  Objection.  Relevance, your Honor.

            THE COURT:  Overruled.

Q    (By Ms. Perry) What was your understanding about a trust account with UML?

A    What was explained to --

            MR. EDNEY:  Objection, your Honor.  Lack of foundation.

            THE COURT:  Why don't you see if the witness developed any such understanding first.

            MS. PERRY:  Okay.

            THE COURT:  Sustained.

Q    (By Ms. Perry) In this e-mail from Mr. Keogh, he references that a new trust account was established with a trustee in D.C.

     Do you see that?

*DIRECT EXAMINATION OF JENNIFER SAIZ*

A    Yes.

Q    Did you have any -- any further discussions with Mr. Keogh about a trust account set up by the UML?

A    Actually, I think it was with Jennifer Cowan.  And what she explained to me was that --

MR. EDNEY:  Objection, your Honor.  Move to strike her testimony.  Calls for hearsay and it is hearsay.

THE COURT:  Is there a reference to this understanding in any of your exhibits, counsel?

MS. PERRY:  Your Honor, I'm just trying to establish when they learned about the trustee.  That's it.  But I can move on.

THE COURT:  All right.  You can just ask that question.  Sustained.

Q    (By Ms. Perry) In this October 2012 e-mail, is that the first time that CAT heard anything about a trustee?

A    Yes.

Q    Had CAT authorized anyone at the UML to transfer government funds intended for CAT to a trustee?

A    No.

MR. EDNEY:  Objection, your Honor.  Assumes facts not in evidence.

THE COURT:  Overruled.

MS. PERRY:  Karen, can you pull up unobjected-to Government's Exhibit 301.  If you could blow this up.

*DIRECT EXAMINATION OF JENNIFER SAIZ*

Q    (By Ms. Perry) Is this an e-mail chain that you received -- or an e-mail you received on November 1st of 2012?

A    Yes.

Q    Does Ms. Cowan attach a letter from a trustee to provide validation of available funds?

And does she go on to say -- go on to state:  "We anticipate payment to CAT in full on or about the 8th of November"?

A    That is correct.

MS. PERRY:  Karen, can you pull up 301.2.

Q    (By Ms. Perry) Was this an attachment to that e-mail?

A    That's correct.

Q    What did you understand was happening at this point in time?

A    What was explained was that they had to transfer the money to a trust because of the size of the payment, and that's -- and it had to be timing before the funds could be released to CAT.

Q    Did you have any understanding as to who was transferring funds into a trust account?

A    None at all.

MR. EDNEY:  Sorry, your Honor.  But I'm going to object to lack of foundation again.

THE COURT:  Well, she said she didn't have any knowledge about it, so overruled.

*DIRECT EXAMINATION OF JENNIFER SAIZ*

MS. PERRY:  Karen, can you pull up Government's Exhibit 201 again?

Q    (By Ms. Perry) Ms. Saiz, we were just talking about this November 1st e-mail of 2012 from Ms. Cowan to you.

Do you remember that?

A    Yes.

Q    I'm going to mark on this exhibit a line around November 1st of 2012.

Do you see that?

A    Yes.

Q    And does that line appear to fairly mark November 1st of 2012?

A    It does.

Q    As of the date of this correspondence, did Mr. Keogh disclose to CAT that the government had made a series of payments into the UML bank account for the April, May, June, July -- sorry -- the April, May, and June flights?

A    Not specifically, no.

Q    Do you know of any reason why, if UML had received payment from the government in its own bank account, it could not have just remitted that -- those funds to CAT via wire?

A    No.

Q    At any point did CAT decide to stop operations as a result of any nonpayments or partial payments from CAT -- or from UML?

A    We did not.

Q    Why not?

A    Just because the end use customer would have been the one impacted, and that's who the primary relationship was for Commuter Air Technology.

MR. EDNEY:  Objection, your Honor.

THE COURT:  Basis?

MR. EDNEY:  Relevance.

THE COURT:  Overruled.

Q    (By Ms. Perry) I'm sorry.  You can continue your answer.

A    Because the primary relationship was with the end use customer for Commuter Air Technology, and we didn't want to impair that relationship, that business relationship.

Q    Had you known that, in the summer of 2012, UML had received about $2 million from the government intended for CAT, what would you have done?

A    Well, I would have recommended, as the contracts manager, to the Commuter Air and Acorn Growth group that we reach out directly to the government instead of trying to continue to go through UML.

MS. PERRY:  Your Honor, may I have a moment?

THE COURT:  You may.

(Brief pause.)

MS. PERRY:  Pass the witness, your Honor.

THE COURT:  Mr. Edney, you can proceed with cross

*DIRECT EXAMINATION OF JENNIFER SAIZ*

for about 15 minutes before we take a lunch break or would you rather just start up after the lunch break?

MR. EDNEY:  I think it would probably make sense not to break it up, if it's okay with your Honor.

THE COURT:  Certainly.

MR. EDNEY:  After lunch would be fine with us.

THE COURT:  Certainly.

Ladies and gentlemen of the jury, it's 12:00.  This is a good time for you to go to lunch.  Please be prepared to come back into the courtroom at 1:15 -- that's an hour and 15 minutes from now -- to continue.

Remember you are not yet free to discuss this case, not even among yourselves.  You may go.

(The jury exited the courtroom.)

THE COURT:  The jury has departed.

Is there anything we need to take up before we have our lunch recess?

Government?

MS. PERRY:  No, your Honor.

THE COURT:  Defense?

MR. EDNEY:  One matter, your Honor.  I want to make a record on that last relevance objection.  For another time the government has now elicited testimony as to the harm to one of these third parties.

First it was Oklahoma State University and having to pay

out the $3 million.  Then it was First Pryority Bank.  Now it's -- now it's Commuter Air Technologies and what it would have done and how it would have dealt with -- had it impacted their operations with national security.

We, in turn, your Honor --

MR. RAM:  The witness is still here.

THE COURT:  All right.  Thank you.

You don't need to be here for this, ma'am.

THE WITNESS:  Okay.

THE COURT:  You can step down.  During the break, don't discuss your testimony with any other witness.

THE WITNESS:  Yes, sir.

MR. EDNEY:  Mr. Ram makes a fair point.  Sorry about that.

(The witness exited the courtroom.)

THE COURT:  All right.  Go ahead, Mr. Edney.

MR. EDNEY:  In turn, your Honor, due to objections from the government, we have not been permitted to elicit testimony regarding mitigation measures regarding those categories of harm.  And, you know, that has been -- that has been over my disagreement with both government and the Court.

I do want to make a record though, your Honor, that the government continues to open the door to this, kind of, "what is the impact of what is going on here" testimony, leaving that with the jury.  And it is creating a problem, an

*DIRECT EXAMINATION OF JENNIFER SAIZ*

asymmetry, when we're not able to press on that and cross-examine about that.

There is all sorts of responses to what she just said on the stand, as there is for those other three categories.  It will elongate this trial, but it is something -- it is a problem that the government is creating in this case.  It's not a problem that we're creating by trying to bring in things that are extraneous.

THE COURT:  Okay.

MR. EDNEY:  I wanted to make a record on that.

THE COURT:  Thank you.

I disagree with your characterization.  To some degree, you have been able to go into testimony about, for instance, Dr. Keogh paying monies of his own to try to ameliorate some of these effects.

Also, this witness did not go into any detail about any harm to CAT or anyone else.  She simply explained why she didn't take actions, which I think clearly could be going on in the minds of the fact-finder, why she and CAT didn't take actions to go straight to a government contracting officer or to the government while all these delays were going on.  So I disagree with your characterization.

And I also disagree that your side hasn't been trying to get into areas that the Court has placed off limits and hasn't been trying to actively open the door yourself so that you

*DIRECT EXAMINATION OF JENNIFER SAIZ*

guys can get into other stuff.  I think it's been going on on your side too.  I'm not convinced that this is what the government was up to.

I appreciate your record, but it doesn't change anything, at least as to my rulings.

Is there anything else, Mr. Edney?

MR. EDNEY:  No, your Honor.

THE COURT:  All right.

Court is in recess.

(A lunch recess was taken.)

THE COURT:  Cross-examination, Mr. Edney?

MR. EDNEY:  Yeah.

THE COURT:  Uh-oh.

MR. EDNEY:  Are we going to ask you questions?

THE COURT:  Well, you know, it's my habit to come in and look around the courtroom and make sure all the necessary players are in place, and the one time I don't do it.

MR. EDNEY:  I'm happy to give you some small talk until she gets here.

THE COURT:  Mr. Stephens?

MR. STEPHENS:  Sure, your Honor.  I think she left before anyone spoke with her during the last recess.  And she's not in the hallway.  Our victim coordinator is trying to call her.  So we will advise if we hear anything more.

THE COURT:  Okay.  Well, since I don't know how long

*DIRECT EXAMINATION OF JENNIFER SAIZ*

this is going to take, I think I'll just allow the jury to go out -- we'll stay here in place for a few minutes to see if anything changes.

I apologize, ladies and gentlemen of the jury. I'm typically informed that we're missing a key participant, but I wasn't in this case, so I apologize.

(Brief pause.)

THE COURT: Ladies and gentlemen of the jury, what we're going to do -- we're making some arrangements for it right now. The courtroom next door is vacant this week, and so we're going to get it opened up and get the lights on over there. We're going to stage you over there because I don't think this is going to take very long. That's my hope anyway.

And if it turns out that, you know, we can turn this around here in just a few minutes, we'll just bring you over from next door, and so we won't have to do the -- you know, it takes 15 minutes to get you once you guys get down there in the jury -- the jury assembly room. So that's our plan, so just stand by for a minute.

(Brief pause, after which the witness resumed her seat in the witness box.)

THE COURT: Ms. Saiz, go ahead and take your place on the witness stand.

THE WITNESS: Yes, sir.

THE COURT: Ladies and gentlemen, after you departed

the courtroom for lunch, Ms. Saiz remained in the courtroom for a few minutes, but I had some matters I had to take up with counsel that took some time and I neglected to, I think, inform Ms. Saiz about the time to come back.  So I'm going to take responsibility for this.  Again, I apologize.

But we're all here now ready to go.

Ms. Saiz, are you ready to go?

THE WITNESS:  Yes, sir.  Apologies.

THE COURT:  All right.

Cross-examination, Mr. Edney?

MR. EDNEY:  Yes, your Honor.  Thank you.

**CROSS-EXAMINATION**

BY MR. EDNEY

Q    Hello, Ms. Saiz.

A    Hi.

Q    Is it Ms. Say-ez?

A    Size, like your shoe size.

Q    Oh, size.

A    Uh-huh.

Q    That's a good one to remember.  Like your shoe size.

MR. KAST:  Your Honor, may I?

THE COURT:  You may.

(Mr. Kast handed exhibit binders to Court, counsel, and witness.)

Q    (By Mr. Edney) Well, Ms. Saiz, I very much appreciate you

being here.

A    Thank you.

Q    My name is Michael Edney.  I'm a lawyer that represents Web Keogh over there in this case.  I'm not going to keep you here very long.  I just have a handful of questions.

A    Okay.

Q    But, again, thanks very much for joining us.

You know, in part, because it's a little easier for me to remember what happened, I'm going to pick up, I think, where Ms. Perry, the prosecutor, left off in her questioning of you.

A    Okay.

Q    And I think about where she left off was concerning Government's Exhibit 301.

MR. EDNEY:  Perhaps we can pull that up.

Q    (By Mr. Edney) There it is.

MR. EDNEY:  So if we could go up to the top there.

Q    (By Mr. Edney) This is an e-mail -- and it looks like printed off your computer -- from Jennifer Cowan to you and a whole bunch of other people.

Do you see that?

A    Yes, sir.

Q    And the date of it is November 1, 2012.  Do you see that?

A    Yes.

Q    And it attached -- it attached a letter.

MR. EDNEY:  Maybe we can turn to that on the second

page.

Q    (By Mr. Edney) Do you remember Ms. Perry asking you a few questions about this letter?

A    I do.

Q    And this letter was about funds that were with a trustee that could be used to pay your old company.

Do you remember that?

A    That's correct.  Yes.

Q    And then after she showed you this, she showed you another government exhibit.  It was Government's Exhibit 201.

MR. EDNEY:  Maybe we could pull that up.

Yeah, there it is.

Q    (By Mr. Edney) And if I recall correctly -- and you can correct me if I'm wrong -- she went in there and kind of drew a line by November 1st?

A    Uh-huh.

Q    This thing actually works.  How about that?

Okay.  Kind of there (indicated) somewhere; right?

A    Yes.

Q    Do you remember her doing that?

A    I do.

Q    And then she -- I think she drew a circle around all these green payments down here from the government.

Do you remember her doing that?

A    I do.

Q    And she -- and these payments were -- looks like some of them were in the August-September 2012 range.

Do you see that?

A    Yes.

Q    And Ms. Perry suggested to you, as of November 1st, which is, of course, ten years ago, so a long time --

A    Right.

Q    -- that no one from UML, or my client, Web Keogh, had disclosed to you or anyone at CAT that the UML had received these payments.

Do you remember her asking that?

A    I do.

Q    Okay.  And you agreed with her; right?

A    I told her not specifically into the UML account.

Q    Yeah.  And I think the suggestion there, that that failure to disclose, it might have been wrong in some way.

Do you remember that?

A    In wrong for?

Q    Wrong for Dr. Keogh or the UML.

You remember that implication?

A    I guess I didn't understand that implication.

Q    Okay.  Fair enough.

Now, this was all ten years ago.  And I tell you, we've been trying to figure out what happened ten years ago and we have a bunch of e-mails and documents from back then, and so

does the government.  I want to show you a couple of those.

Okay?

A      Okay.

Q      Let's go to Defense Exhibit 1379, please.

           MR. EDNEY:  And this is, I believe, unobjected to.

Q      (By Mr. Edney) Okay.  So this is an e-mail --

           MR. EDNEY:  If we can go to the top there.

Q      (By Mr. Edney) This is an e-mail on which you're copied.

Do you see -- there we go.

      The e-mail on which you're copied, you see your e-mail

there; right?

A      Yes, I do.

Q      And it's dated September 12, 2012; correct?

A      That's correct.

Q      Let's just go back to Government's Exhibit 301 for just a

second.

           MR. EDNEY:  And go up to the top.

Q      (By Mr. Edney) That's about -- that's about a month and a

half before this November 1st e-mail that Ms. Perry was asking

you about.

A      September 12th, correct.

Q      Yeah.  And that line she drew down on the chart.

A      For November 1st, correct.

Q      Okay.

           MR. EDNEY:  Now, let's go back to Defense Exhibit

1379.  Let's go to the bottom e-mail there.

Q    (By Mr. Edney) And we have an e-mail from Jennifer Cowan to Darryl.

I take it that's your colleague, Darryl Wilkerson; is that right?

A    He was my functional boss, that's correct.

Q    He worked there with Commuter Air Technologies just like you did; right?

A    That's correct.

Q    And you are copied on all of this, too.  Yeah?

A    Uh-huh.  Yes.

Q    And it reads as follows:

"Darryl, good morning.  The UML received a payment from DFAS last night.  I'll wire $400,000 today to CAT.  On Thursday, the UML will begin making other initial payments after we have processed the incoming payments."

Do you see that?

A    Yes, I do.

Q    So in this September 12th e-mail, Jennifer Cowan, who works at the UML -- is that right?

A    That's correct.

Q    -- is telling Mr. Wilkerson and a whole bunch of other folks, including yourself, that the UML just got a whole bunch of money in from the government.

Do you see that?

A    I do.

Q    Okay.  Let's go to Government's Exhibit 1542.

THE COURT:  You mean Defense Exhibit 1542?

MR. EDNEY:  Yeah, I think it is Defense Exhibit 1542.  Thank you, your Honor.  Lots of numbers in this case.

Q    (By Mr. Edney) So let's go up to the top there.  This is an e-mail -- actually, why don't we start down at the bottom, if I could.

MR. EDNEY:  Let's look at that bottom e-mail.

Q    (By Mr. Edney) This is an e-mail from Jennifer Cowan to you and a bunch of other folks.  Do you see that?

A    I do.

Q    And Web Keogh is copied there; right?

A    Yes.

Q    And it's dated October 5, 2012.  Do you see that?

A    Yes.

Q    And that's -- that's about a month before this, kind of, big red line the government was drawing on the sheet of paper?

A    That is correct.

Q    The line where it suggested to you that payments that the UML had received had not been disclosed to Commuter Air Technologies or you; right?

A    Correct.  And, again, I answered not specifically those payments.

Q    I know.  Look, I'm not trying to give you a hard time.

What I'm actually trying to do is deal with one of the government's assertions here.

A    Gotcha.

Q    Just let me be clear about that.  Look, this happened a long time ago.  But we have these documents and the government has them too, so --

A    Okay.

Q    -- we all need to know about them.  Okay?

So let's look at that second sentence there.

MR. EDNEY:  The whole thing.

Q    (By Mr. Edney) Ms. Cowan, who works for the UML, was telling you as follows:

"The UML received notification of payment from DFAS for the final $1.3 million outstanding on September 28th, which is allowing us to increase next week's payment to $2.9 million."

Do you see that?

A    I do.

Q    So Ms. Cowan there is telling you and some of your colleagues, including Web Keogh, that the UML had received the final payment on all your invoices from DFAS; is that right?

A    That's what she's saying there, yes.

Q    And DFAS is -- I guess that's the government, isn't it?

A    Defense Finance Accounting Services.

Q    Yeah.

A    Payment processors.

Q    Yeah.  We've got a bunch of those acronyms in this case so -- okay.

So as of October 5th, they're disclosing to you that UML has got all the money that CAT is owed; right?

A    Yes.  Still promising to pay.

Q    And it's sitting there in UML's -- UML has it.  It's around; right?

A    According to their e-mail, yes.

Q    And you don't have it yet; right?

A    That is correct.

Q    Okay.  And so -- so when Ms. Perry, the prosecutor, suggested to you that UML had not disclosed to CAT or you on November 1, 2012, that it had received all these September payments from the government, that was wrong, wasn't it?

A    According to this e-mail, yes.

Q    Okay.  Thank you.  I appreciate you taking the time to walk through all these documents with us.

As I told you, we have them, but, you know, this happened ten years ago.  But I think it's important for the jury to see the sequence of events.

Okay.  Before we leave this e-mail, just for our convenience -- this is a little bit off point, but so I don't have to come back, let's look at that last line there in it. Do you see that?

"Web and I will reevaluate cash flow next week to

determine the remaining payments to CAT and advise at soonest."

Q    Do you see that?

A    I do.

Q    So in this October 5th e-mail, Jennifer Cowan is telling you that UML is kind of working on getting you paid off of the cash flow that UML has available; right?

A    Correct.

Q    And you've heard things like that before, right, that UML would kind of get Commuter Air Technologies paid when it had the cash to do so; isn't that right?

A    Many times, yes.

Q    Okay.  That was a consistent theme coming out of UML and Dr. Keogh; isn't that right?

A    Correct.  Promising to pay.

Q    And it was dependent on the cash that UML had available from its cash flow operations; right?

A    Right.  Not necessarily from the government payments.

Q    Exactly.  And, as a matter of fact, they're telling you here, you know, look, we have all your money; right?

A    That is correct.

Q    But we're going to reevaluate our cash flow and try to do the best we can as UML to get as much money to you as our cash flow needs permit; isn't that right?

A    That is correct.

*CROSS-EXAMINATION OF JENNIFER SAIZ*

Q     Okay.  Thank you, Ms. Saiz.  Thanks for the tedium of going through all of that.  I sure do appreciate it.

Let's go -- before we go too far away from all of this, let's go back to Government's Exhibit 301, because it's a bit of an issue in this case.

MR. EDNEY:  Now, let's go to that second page there.

Q     (By Mr. Edney) This letter about the trust, do you remember being asked questions about that?

A     I do.

Q     Now, just to clarify, as of November 2012, the work CAT was doing under the UML contract, that was -- that was over; right?

A     The timing of finalization, I'm not 100 percent sure without referring to other documents.

Q     I see.  Do you remember that -- CAT's work being done in Afghanistan on or about July 31st?

A     I mean, I'm not sure specifically the timing --

Q     Okay.

A     -- but I know the receivables stopped accumulating once the work finished and then just stayed as a past-due balance.

Q     Well, you know, instead of digging through all those binders over there, which, you know, probably get me a paper cut and waste a lot of your time and ours, let's go back to Government's Exhibit 201.  I bet the answer is there someplace.

A    Looks like August 2012 was the last invoice.

Q    Yeah.  So by November you guys are just kind of cleaning -- trying to get the money in from the work you've already completed; right?

A    That's correct.

Q    There's no work to stop or to continue at that point?

A    That's correct.

Q    Okay.  Now I want to go back a whole other year.  So now we're talking 11 years ago, so it's really digging back into the archives.

      Do you remember Ms. Perry asking you some questions about some delays in CAT getting paid during 2011?

A    Yes.

Q    And I think I wrote down you said that some of those delays started in April 2011.

      Do you remember that?

A    Yeah.  I told her I wasn't sure but I thought maybe April.

Q    Yeah.  I mean, it was a long time ago.  So let's -- let's look at -- let me ask you to turn in that binder there, actually, to Defense Exhibit 1575.  And I will too.

      Ms. Saiz, is the bottom e-mail on the first page of Defense Exhibit 1575 an e-mail from Rhonda Walker to Debbie Robinson at the UML, copying yourself and Christy Jameson?

A    Yes, it is.

*CROSS-EXAMINATION OF JENNIFER SAIZ*

Q     And is it dated September 19, 2011?

A     Yes, it is.

Q     And you recognize -- you recognize the e-mail address there as your own on the first page?

A     I do.

Q     And does it concern some questions you have about the payment of CAT invoices?

A     It does.

MR. EDNEY:  Your Honor, the defense moves the admission of Defense Exhibit 1575 and requests permission to publish it to the jury.

THE COURT:  Any objection?

MS. PERRY:  No objection.

THE COURT:  It's admitted.

Q     (By Mr. Edney) Okay.  So now we're going to put it up on the big screen.  So we have an e-mail here on September 19th, and you're asking for -- or your colleagues here -- I probably should ask that question first.  I don't know who Rhonda Walker is, but I bet you do.

A     She was one of my employees earlier on before Christy Morris became my accounts -- government accounts receivable.

Q     I see.  And Christy Jameson --

A     Was my --

Q     -- did she also work with you?

A     She was my accounting manager.

Q    And Debbie Robinson, she worked over at the UML; right?

A    Correct.

Q    Okay.  And you're asking about some attached invoices.  I think they are attached.

A    Uh-huh.

MR. EDNEY:  Let's go to the next page.  Or the next page after that even.  Yeah, here we go.  So let's just highlight that -- I think right where you are, Johnny.  Right there.  Perfect.

Q    (By Mr. Edney) So this is your -- this is CAT's invoice for work performed in July 2011 --

A    Yes.

Q    -- right?

MR. EDNEY:  And if we can go back to the top -- the e-mail on the first page down at the bottom.

Q    (By Mr. Edney) By September 19th, you're asking when that's going to get paid by the UML; right?

A    That's correct.

Q    So the way this works is you do the work in July, right --

A    (Witness indicates affirmatively.)

Q    -- and then -- you have to say yes or no --

A    Oh, yes --

Q    -- or else --

A    -- work was done in July.

*CROSS-EXAMINATION OF JENNIFER SAIZ*

Q    -- the court reporter is going to get really mad at me -- or more mad at me.

So, yes, you finish the work in July, and then you push an invoice out in the first days of August; right?

A    Correct.

Q    And it's supposed to be due, at this time, 45 days later, right around the middle of September; is that right?

A    Correct.

Q    And you don't have the money there yet; right?

A    That's correct.

Q    Does this all refresh your recollection about when the payments to Commuter Air Technologies started getting a little bit behind?

Was it in September of 2011?

A    Yeah.  Probably September-October timeline.

Q    Okay.  So, yeah, September 2011 for work that you guys performed in July; is that right?

A    Correct.

Q    Okay.  And to this point, you had been paid on time for the most part?

A    That's correct.

Q    So your April -- your invoice for April work got paid on time; right?

A    Everything that had been performed from the previous year -- I think we started the work in September of 20 -- no,

November-December 2010.

Q    Okay.

A    So from the time of inception up until that July invoice, which was the first to start going past due and doing collections is that September 2011 timeline.

Q    Okay.  So this is when the delay starts; right?

A    The first delay, yes.

Q    Yeah.  This is -- this is a delay for payment due to you in September; right?

A    Correct.

Q    For work that CAT performed in July?

A    Correct.

Q    Okay.  Now, I think you had a conversation with Ms. Perry -- and I'm not sure that -- you might not have gotten much of an explanation back then for why this wasn't coming in on time in September.  Is that right?

A    Initially, correct.

Q    Okay.  Let's -- let's move to unobjected-to Defense Exhibit 1314, please.

       So this is a few days later after your e-mail inquiring about the September payment for July services; right?

A    Correct.

Q    Maybe a week or two later; is that right?

A    Yes.

Q    And you get an e-mail from Dr. Keogh here.  You see there

at the bottom e-mail?

A    I do.

Q    And he tells you as follows:  "I wanted to give you an update on everything I heard from DCMA yesterday."

Do you see that?

A    I do.

Q    That's another one of those government offices, I guess?

A    Right.  Defense Contract Management Agency.

Q    See, you've been doing this for a while.

A    A lot of years.

Q    You know.  I don't.

All right.  "The good news is that we were able to confirm that there's nothing incorrect with how we or CAT or any of our other subs have invoiced."

Do you see that?

A    I do.

Q    Then he provides an explanation as follows:

"Internal to the government, they made an error in how they processed payments back in April-June."  Right?

A    Yes.

Q    So he's kind of telling you what's going on there with the government, isn't he?

A    That's correct.

Q    And then he says:  "The position they are currently taking is they want us to refund all of the payments so they

can reissue the same funds correctly."

Do you see that?

A    Yes.

Q    And then he makes a request for you -- of you, I should say.  "What I need from you is just a quick letter stating the financial hardship and the resulting impact on operations this course of action would have for CAT."

Do you see that?

A    I do.

Q    Now, you know, I've been over all these documents, and I need to tell you, Ms. Saiz, you -- when somebody asks you for something, it happens like that (indicated); right?  It's --

MR. EDNEY:  For the court reporter, I snapped my fingers.

Q    (By Mr. Edney) It follows almost immediately.  And you sure did the next day.  And maybe we can turn to, in your binders, Defense Exhibit 1574, and I will do the same.

Now, let me just ask you a couple of preliminary questions about this exhibit for the record.  This is an e-mail from you.

Your name at the time, Jennifer Johnson, now it's Jennifer Saiz; right?

A    That's correct.

Q    Did I get that one right?

A    You did.

Q    Yeah.  And it's to Web Keogh.  Do you see that?

A    Yes.

Q    And Gary Ambrose.  He's a colleague that worked with you at Commuter Air Technologies; right?

A    He was, uh-huh.

Q    And Darryl Wilkerson.  We talked about him?

A    Yes.

Q    And Jeff Morton.  You talked about him.  He's up in the stratosphere of the organization someplace?

A    That's correct.

Q    Okay.  And it's dated September 28, 2011; right?

A    That's correct.

Q    And you're responding to the e-mail we just read a few moments ago; right?

A    Correct.

      MR. EDNEY:  Your Honor, the defense moves the admission of Exhibit 1574 and requests permission to publish it to the jury.

      THE COURT:  Any objection?

      MS. PERRY:  No objection.

      THE COURT:  It's admitted.

Q    (By Mr. Edney) Okay.  Here's all that mysterious stuff we were just talking about, and your response.

     Just the very next day, you come back to him with the letter that Web requested; right?

A    That is correct.

Q    You say:  "Sorry for the delay.  Attached is the letter as requested."  There wasn't much of a delay here.  "Please let me know if this is what you were looking for.  I think it shows a good picture of why it is unrealistic to ask for the funds to be repaid and await on reimbursement.  Please let me know if you have any comments or changes."

Do you see that?

A    Yes.

Q    And then we have a letter attached there on the next page.

MR. EDNEY:  Maybe we can blow that up a little bit.

Q    (By Mr. Edney) Is this the letter --

MR. EDNEY:  Maybe not that far in.  Maybe if we can blow up everything south of the letterhead.

Q    (By Mr. Edney) Okay.  Is this the letter that you drafted up for Dr. Keogh?

A    I did.

Q    And you write in here --

MR. EDNEY:  If we could go to the first paragraph. Blow it up a little bit.

Q    (By Mr. Edney) -- "I'm in receipt of your e-mail regarding the government's request for return of funds for invoices that were improperly processed for payment."

Do you see that?

*CROSS-EXAMINATION OF JENNIFER SAIZ*

A     I do.

Q     And I'm going to drop the acronyms here.

"While the government's position is unfortunate, as a subcontractor we have submitted all pricing and invoicing in accordance in our subcontract agreement with UML."

Do you see that?

A     I do.

Q     And then we have the next sentence:

"As a small business, we have limited cash and access to only a limited line of credit.  To refund all payments, as outlined below, would create an extreme hardship on CAT."

Do you see that?

A     I do.

MR. EDNEY:  And then let's blow it out a little bit more.  If we could just -- if we could just highlight the paragraph above that table and the paragraph below it, and blow it up a little bit.  Okay.  That's great.

Q     (By Mr. Edney) So then you have -- then you have that table there.  These are the payments that are -- the government is asking to be refunded as outlined below; right?

Do you see that?

A     Yes, I see it.

Q     And you have the -- you have CAT's invoice for work performed in April; right?

A     Yes.

Q    And that's -- boy, that's a little bit more than $900,000, right, when it comes right down to it?

A    Correct.

Q    And then you have the invoice for work UML performed in May; right?

A    That CAT performed in May, uh-huh.

Q    Oh, yeah.  Good point.

A    Uh-huh.

Q    Got it.  So many words here.
     So you got the invoice for work that CAT performed in May; right?
     That's a little bit more than $900,000; right?

A    Correct.

Q    And then you have the invoice for work that CAT performed in June; right?

A    Correct.

Q    And that's a little bit -- that's $962,000 or so; right?

A    Yes.

Q    And as of the date of this letter, September 27, 2011, CAT had been paid for all those; right?

A    Correct.

Q    So that would be a problem if you had to send all that money back to the government; right?

A    Correct.

Q    And then we have the invoice for July; right?  And that's

a little bit more than $900,000; right?

A    Correct.

Q    And you hadn't been paid for that yet, right?

A    That is correct.

Q    And we have the invoice for August, and that's about $860,000; right?

A    Correct.

Q    But your understanding was that the government was asking some combination of CAT and UML to send all this money back to the government; right?

A    Right.  From the e-mail sent from Web.

Q    And UML had some of that money; right?

A    Correct.

Q    And CAT had some of that money?

A    Correct.

Q    And that was going to be -- that was going to be a big problem, because what you wanted is to keep the money you had; right?

A    Correct.

Q    And to get the money that UML had into your coffers; isn't that right?

A    That's correct.

Q    So you had a conversation here that provided you a fair amount of detail about what UML had and what CAT had; right?

A    Correct.

*CROSS-EXAMINATION OF JENNIFER SAIZ*

Q    And you're helping Dr. Keogh deal with this request from the government that we send all this money back and kind of start over again; right?

A    Correct.

Q    And you were understanding there in this next sentence that, well, geez, you know, even if we send all this money back to you and you kind of turned it right around and got it back to us, right, that would still be a big problem because, you know, we don't like writing $3 million checks and we would prefer to have the money that UML has already.  Right?

A    Absolutely.

Q    And this -- this issue with the 1903 contract, right, this issue about whether we send the money back or whether the government keeps paying, it didn't get resolved until February 2012; right?

A    I'm not sure of the resolution.  I'm only privy to what was sent to me.

Q    I see.  So if we had a document -- maybe we'll look at it --

A    Okay.

Q    -- and we can figure out when that resolution happened.

But it wouldn't surprise you to learn that the government never really finally sorted this out until February of 2012?

A    It would not surprise me in my dealings with the government, that's correct.

Q    That's right.  Because the government doesn't move like lightning, does it?

A    Not on certain things for inaccurate payments.

Q    You've got to beat on the government sometimes to get money out of it; right?

A    I don't know what you have to beat, but you have to be very diligent and very detailed.

Q    You've got to give them a hard time and keep after them, and sometimes even then the government doesn't cough up the money; isn't that right?

A    That's correct.

Q    Okay.  And you were working with Dr. Keogh to try to, you know, get the government to do its job; isn't that right?

A    Every instance we were asked for help, I provided immediate help.

Q    And the problem here was that the government had this ridiculous request to send all the money you had back; right?

A    According to the request we got, yes, that's correct.

Q    And then all the money that UML had back; right?

A    Correct.

Q    And then at some point, when they got around to it, they would pay you guys?

A    That's correct.  My belief.

Q    Okay.  So I -- just so we're going in chronological order a little bit, I want to fast-forward the clock to January 20,

2012, thereabouts.

Do you remember Ms. Perry asking you a series of questions about a meeting that you had with Dr. Keogh around that time?

A    Yes.

Q    And that was because the UML was a bit behind on its bills to you folks --

A    That is correct.

Q    -- right?

A    That is correct.

Q    And they owed you -- I think what Mr. -- was it Mr. Davis?  He said it was 2.1 million bucks or something.

A    That's correct.

Q    Is that right?

Okay.  And I may be wrong about this so I'm going to ask you to correct me.  You don't remember all the details from that meeting, do you?

A    No.  Not without referring to notes or e-mails or et cetera.  That's way too long ago.

Q    No kidding.  Right?  That's ten years; right?

A    Right.

Q    And you don't have any notes from that meeting, do you?

A    Somewhere at CAT they reside.

Q    Oh, really?

A    I always carried a binder around everywhere.  But if --

when anything was specific to this, we may have created it and submitted it to you guys.

Q    Oh, so you think there may be notes of this meeting you had with Dr. Keogh at Commuter Air Technologies someplace?

A    I believe there probably are somewhere.

Q    I bet you're a note taker.

A    I am, very.

Q    Did you bring one of those notebooks to every one of your meetings?

A    Every one.  Except for here.  They said I couldn't bring nothing.

Q    Well, that's fair enough.  Well, we've got plenty of paper for you to look at.  There's no problem with that.

      Okay.  So you think there might be notes from that meeting, huh?

A    Right.

Q    Okay.  And you actually expect that there are probably notes from that meeting; correct?

A    I do.

Q    Okay.  Well, that's --

A    If the predecessor of mine didn't get rid of them.

Q    That's good.  All right.  And let me ask you this.

      Did you meet with the government to prepare for this testimony a little bit?

A    I did meet a few times.

*CROSS-EXAMINATION OF JENNIFER SAIZ*

Q    And they didn't show you any notes from the January 20th meeting of yours, did they?

A    Not of my own, no.

Q    Did they show you notes from anybody else?

A    No.

Q    Okay.  All right.  Now, you did remember a few things from that meeting, if I recall correctly?

A    Right.  From the high levels.

Q    Yeah.  And at the high level, you don't remember Dr. Keogh providing any explanation for why the payments were delayed; right?

A    Not why.

Q    Yeah.  Just recognizing that they were; is that right?

A    It's just the same issue.  We're having issues with the government agencies.  That's it.  Very high level, no level of detail.  And then the promise to pay, that we're going to come up with a payment plan and get it sent to you.

Q    Yeah.  I mean, kind of some of the issues that we were just talking about a few minutes ago; right?

A    Correct.

Q    That same stuff; correct?

A    Even in that meeting with myself and Jeff Morton, it was very -- it was not that level of detail.

Q    Right.  He didn't get into specifics?

A    That's correct.

Q    It's just a way up here (indicated) someplace?

A    That's correct.

Q    Okay.  And you don't recall asking any questions in that meeting about asking for more details; right?

A    I asked if there was anything that we could do for help -- additional help.  And the main reason I recall it was at a high level is because after the meeting, when we met -- Jeff Morton and I met internally, there was nothing new.  There was no new news.

     And so, again, when you're owed this level of money, we were hoping to get more info, but it was always, We're working on the problems, you know.  So that's the only reason I can recall at that high level that that's where we were.

Q    And you don't remember asking -- other than asking whether there's something you could do to help, you didn't ask for more details on why the payments hadn't been -- hadn't come yet; right?

A    No.

Q    And you don't recall your colleague, Mr. Morton, asking either, do you?

A    No.  Again, just reiterating the importance of we need the money.  We need to get paid.

Q    Now, Dr. Keogh said in that meeting that, you know, we're going to work out a payment plan from the cash that we have at UML and try to get it over to you; is that right?

A    That is -- well, he said he was going to work a payment plan.  He didn't talk about cash or specifics like that, but he said he was working a payment plan and trying to get us paid.

Q    I mean, you took from that -- the impression was that, you know, he was going to go back to the lab, so to speak, and try to figure it all out; right?

A    Yes.  That's what we believed.

Q    And did he give you a payment plan there or was it later?

A    No, it was later.

Q    Okay.

A    He said he had to go back and look at everything.

Q    Did he call you up with that or did he send you an e-mail?

A    I honestly don't recall.

Q    Okay.

A    I know there was a final payment plan that came because that's what stemmed the e-mails of collection requests of, Hey, it's the 10th, we don't have payment yet.  Hey, it's the -- what's happening?  We don't have an update, et cetera.

Q    Okay.  And so you don't know whether it came over e-mail or he gave you a phone call at some point?

A    I don't remember, to be honest with you.

Q    Okay.  And when you prepared for your testimony with the government, they didn't show you an e-mail with this payment

*CROSS-EXAMINATION OF JENNIFER SAIZ*

plan that was laid out by Dr. Keogh?

A    No.  I don't recall seeing an e-mail with a payment plan.

Q    So if he wrote it down and sent it to you, the government didn't show it to you, did they?

A    I've not seen it, no.

Q    Okay.  So -- that's helpful.

Let me show you an e-mail that Ms. Perry chose not to show you.  Let's go to Defense Exhibit 1343, please.

MR. EDNEY:  And this is unobjected to, fortunately, because it's already up on the television.  And if we can blow this up just a little bit so we keep -- so we keep everything except for her signature down at the bottom.

Okay.  Perfect.  Thank you.

Q    (By Mr. Edney) So this is an e-mail from -- down at the bottom from you to Dr. Keogh on February 29, 2012.

Do you see that?

A    Yes.

Q    And that's -- that's like a month and some change after your meeting with him; is that right?

A    That's correct.

Q    You state as follows:

"Web, just wanted to send you a side note and thanks for having the account caught up by today as you originally promised.  I really appreciate your efforts and support through this last several months of payment struggles.  Have a

great day."

Do you see that?

A    Yes, sir.

Q    So does this refresh your recollection about what was going on in that payment plan?

Had Dr. Keogh promised to get all caught up by February 29, 2012?

A    I'm not sure the specific day he promised, but according to my e-mail this day, that's the day that they got caught up from being behind the first time.

Q    And you say there:  "Thanks for having the account caught up by today, as you originally promised."

Do you see that?

A    Yes.

Q    Do you think you were referring there to the payment plan he put together for you?

A    Yes.

Q    Okay.  And he did get caught up; right?

A    Yes.  According to the e-mail, yes.

Q    So as of February 29, 2012, Dr. Keogh and the laboratory, they were current with Commuter Air Technologies; right?

A    That's correct.

Q    And for the first time in a long time, you were happy --

A    Very.

Q    -- right?

A    Very.

Q    Good.  Good.  Well, at least that happens -- at least there's sometimes where we can be happy; right?

A    Right.

Q    Okay.  So here's -- let's move on to a slightly different topic here.  You know, I think this is really a piece of what we've been talking about.

The prosecutor, Ms. Perry, showed you a series of communications between you and UML employees about payments to CAT.  We've been over a few of those; right?

A    Yes.

Q    And I've been over a few more, right, with you?

A    Correct.

Q    And, you know, I read -- well, let me ask you this.

Historically, when you were at Commuter Air Technologies, you maintained a whole binder of documents and e-mails about what was going on with the UML and how they were or were not getting money to you; is that right?

A    Correct.

Q    And you maintained that binder to determine what UML had told you about payment issues and what the status was; right?

A    That's correct.

Q    And to get a complete picture of what the UML had told you about the payment issues, you would often have to go and consult your binder; right?

A    Right.

Q    Because if we didn't have everything that was in the binder, that would be -- you would have an incomplete picture of what they were saying; right?

A    That's correct.

Q    And on top of this, you're a fastidious note taker, so you were -- every time you talked to these folks, you were trying to write something down; right?

A    Correct.

Q    And so you had the binder and you had your notes; right?

A    That's correct.

Q    And was it fair to say that you would regard the binder as kind of the Bible of what you've been told or what you hadn't been told?  Is that right?

A    Right.  Right.

Q    Okay.  So let's just go over -- let me ask you this.

Did the government show you your binder when you came in to prepare for your testimony?

A    No.  We talked on the video -- the video chat.  And then I think during the deposition I tried to refer to some things. But the timeline of events -- I have not held that binder since I turned it over to you guys.

Q    I see.  You turned it over to who?  Your old employer, Commuter Air Technologies?

A    Right.  Whoever requested me to prepare it.

Q    I see.

A    Right.

Q    Okay.  And was that -- was that -- that was your old bosses at Commuter Air?

A    Darryl Wilkerson.

Q    I see.  Okay.  Now, I want to go over a handful of things that -- of other communications about these payment issues.

Do you remember that the UML would pass along communications they had received from the federal government about the payment delays and what the problem in the federal government was and how it could be fixed?

A    There was one instance where I was caught -- I was forwarded an e-mail.  I'm not sure if it was from DFAS or from DCMA.  And Jennifer Cowan was who forwarded it to me.

Q    Okay.

A    Other than that one e-mail, I never got copied on anything from the actual government client or customer.

Q    Well, yeah.  I mean, it was ten years ago now; right?

A    That's correct.

Q    Okay.

MR. EDNEY:  So let's look at Defense Exhibit 1356, if we could, please.  I believe this is unobjected to so we can put it up on the screen.

Q    (By Mr. Edney) So this is an e-mail from Christy Morris to you, Ms. Saiz --

A     Uh-huh.

Q     -- and Jennifer Cowan; right?

A     That's correct.

Q     And Christy Jameson, who, I guess, also worked with you; right?

A     Yes.

Q     And it was dated June 14, 2012.  Do you see that?

A     Yes.

Q     Now --

        MR. EDNEY:  Johnny, this is going to be a hard one, but could you blow up the left, kind of, side of that piece of paper?

Q     (By Mr. Edney) Do you see those little faint hole punches there?

A     Yes.

Q     Do you think this was out of your binder?

A     It's possible, or it could be part of the invoice binder as well.

        MR. EDNEY:  Scroll up to the top.

Q     (By Mr. Edney) This is -- do you see at the top "Jennifer Saiz" there, that note?

A     Yes.

Q     Yeah.  You -- do you know that sometimes when you print e-mails off your own system --

A     Yep.

*CROSS-EXAMINATION OF JENNIFER SAIZ*

Q    -- it kind of puts your own name up there?

A    Uh-huh.

Q    And this was -- I guess this was after you changed your name.  I don't want to presume -- did you get married?

A    I got divorced.  Even better.

Q    I see.  I knew I shouldn't have asked that question.
     So that's -- it's quite possible this is from your binder; right?

A    Or part of my invoice binder that we made copies of.

Q    Okay.

A    Yeah.

Q    Now -- now, down at the bottom there, we have a forwarded e-mail from Sherri Ashby at one of these government agencies; right?

A    That's correct.  SOCOM.

Q    And this is something that the UML sent along to you; right?

A    They forwarded it to us.

Q    Okay.  And it reads as follows:
     "Jennifer, I wanted to let you know what's going on with this.  The funding that we received for this was issued by the Army in their accounting system.  Unfortunately, this is a classified order.  It isn't supposed to be on the system.  We are" --

          MR. EDNEY:  And we can go to the next page.

Q    (By Mr. Edney) -- "going to need to do a modification to" order -- "to the order to replace the funding, but we can't do that until we actually receive the new funding.  This is going to take a little bit of time, and DFAS will not be able to pay out on your invoice until we get that new funding.  Right now I don't know when we will get the money.  As soon as I have updated information, I will let you know."

Is that right?

A    That's correct.

Q    So Jennifer Cowan, who works at the UML, was forwarding on to you an explanation from the government about why some of the payments are held up?

A    That's correct.

Q    And she provides a fair bit of explanation; right?

A    Correct.

Q    And it's about -- it was about some modification to an order not coming through yet; right?

A    Somewhat, yes.

Q    And not entirely surprising, the government says we're working on it but we don't know when we're going to get it finished; right?

A    That is what they said.

Q    Okay.  Let's move to Defense Exhibit 1362.

So this is -- this is another forwarded e-mail from Jennifer Cowan to your colleague, Christy Morris, and then on

*CROSS-EXAMINATION OF JENNIFER SAIZ*

to you; right?

A     Yes.

Q     It has those 3-hole punch holes in the left side.

Do you see that?

A     Yes.

Q     And here Ms. Cowan is forwarding on to your team an e-mail from Mary Lou Johnson -- I'm sorry -- it's forwarding on an e-mail again from Sherri Ashby over at USSOCOM; right?

A     Correct.

Q     And it reads as follows:

"Sorry.  I was on vacation last week.  We're still waiting for the funds to be resent in proper format.  We've requested it again today.  As soon as I have it, I'll get the mod to you.  Sorry this is taking so long."

Do you see that?

A     Yes.

Q     So this is another forwarded e-mail from the government about a month after the first one; right?

A     Yes.

Q     All right.  Let's move on to Defense Exhibit 1370, to which there has been no objection.

This is an August 14th e-mail, you know, again from Christy Jameson to you.  Right?

A     Correct.

Q     And Christy Jameson is a member of your team; right?

A    That's correct.

Q    And she is passing along an e-mail from Jennifer Cowan to her; right?

A    Yes.

Q    And this itself is forwarding an e-mail from the government --

MR. EDNEY:  If we can go down to, I think, probably the next page.  There we go.

Q    (By Mr. Edney) All right.  This is -- the e-mail you are getting forwarded is from Mary Lou Johnson at DFAS; right?

A    Correct.

Q    That's anther one of those government agencies, many of the ones who are responsible for getting you guys paid; right?

A    Correct.

Q    And it reads as follows:

"This is a follow-up inquiry to ask if a modification has been issued to delete" -- I don't even know if I want to say that out loud -- "the GFEBS LOA and provide an LOA for the legacy system and payment."

Is it fair to say there's a lot of terms in here that are complicated?  Right?

A    Right.

Q    And then she says:

"We have three invoices in-house that are now overage ranging from 98 days to 35 days old.  There is one current

*CROSS-EXAMINATION OF JENNIFER SAIZ*

invoice that is pending that is 25 days old due to overage at 30 days.  Hopefully, this mod will come very soon."

Right?

A     Correct.

Q     So you're getting forwarded on from UML some internal communications from the government that kind of says exactly what is going on; right?

A     Correct.

Q     And it's providing some information on exactly the invoices that the government is holding onto; right?

A     That's correct.

Q     And UML just pushed this information right along to you to keep you informed; isn't that right?

A     Correct.  On the same instance.

Q     Okay.  Let's go to Defense Exhibit 1377, to which there has been no objection.

This is an August 29, 2012, e-mail from Jennifer Cowan to Darryl Wilkerson and a whole bunch of other people, including yourself.  Do you see that?

A     Yes.

Q     And, again, here the UML was forwarding on an e-mail from Ms. Ashby over at the United States Government; is that right?

A     That's correct.

Q     All right.

MR. EDNEY:  If we can just blow that up there for a

*CROSS-EXAMINATION OF JENNIFER SAIZ*

second so the jury can see it.

Q    (By Mr. Edney) All right.  So Ms. Ashby is with the government, yes?

A    Correct.

Q    And we just go -- we go to the next page.  And that reads as follows -- maybe it's so small I need to pull it up here.  Sorry.

Well, you are getting an update about the funding document that's going to come through.

Do you see that?

A    Yes.

Q    And if we go down a bit, you get a whole bunch of other information about how the funding document is going to be delivered; right?

A    Correct.

Q    And maybe if we go up to the first page.

MR. EDNEY:  And we can blow up Ms. Cowan's e-mail.

Q    (By Mr. Edney) Forwarding on all this detail from the government about the government's payment delays, and she says as follows:

"The required documentation to allow for the modification will be delivered to SOCOM no later than this Friday.  The modification will be processed immediately and then sent to DFAS for processing."

Do you see that?

A    Yes.

Q    And she says:  "And I anticipate to receive payment next week assuming the plan is executed next Friday."

      Do you see that?

A    I do.

Q    This is around August 29th; right?

A    Correct.

Q    And we just saw a bunch of e-mails about how the UML was telling you those payments were flowing in in September, right, kind of on schedule with this?

      Do you remember those?

A    I don't remember September, but, yes, I remember looking at the previous e-mails.

Q    Okay.  So we're getting -- we're really in the home stretch here.  I want to just ask you a couple of general questions about Dr. Keogh.

      Generally speaking, when Commuter Air Technologies had questions about payment, it dealt with people at the UML other than Dr. Keogh; isn't that right?

A    Typically, when I was involved, I spoke with either Jennifer Cowan or Web.  That was it.

Q    Okay.  And sometimes you would speak to Gary Gallagher; is that right?

A    Initially, when we had issues on the first contracts, I e-mailed Gary Gallagher directly.

Q    And sometimes you would speak to Richard Shultheis; is that right?

A    I would include him as a contracts liaison point of contact.

Q    Okay.  Can I have you turn in your binder to Defense Exhibit 1371, and I will do the same.

Now, Ms. Saiz, this Defense Exhibit 1371, is this an e-mail from Dr. Keogh to you and a bunch of your colleagues over at CAT and Acorn on August 15, 2012?

A    Yes.  And a few UML individuals as well.

Q    Yes.  That's true.  There are a few of those, including Ms. Cowan; right?

A    Yes.  She is on there as well.

Q    Okay.  And is this an e-mail regarding CAT payment status?

A    That is correct.

Q    And, you know, again, looking over at the left side, is this e-mail from -- does this have those 3-hole punch marks on the left side?

A    It does.

Q    And this is an e-mail that you printed for your binder to make sure you had a complete sense of what you were being told by the UML; is that right?

A    I would say yes.

Q    And that's your name printed there on the top, just like

e-mails that get printed show; right?

A    It is, uh-huh.

Q    And this was the binder where you assembled all that you knew from the UML about payment issues; right?

A    For the timeline, yes.

Q    And if you wanted to have a complete sense of what the -- what CAT was being told by the UML or Dr. Keogh, you would consult this binder; isn't that right?

A    Correct.

MR. EDNEY:  Your Honor, defense moves the admission of Defense Exhibit 1371.

THE COURT:  Any objection?

MS. PERRY:  Objection.  Hearsay.

MR. EDNEY:  Your Honor, may I be heard on that?

THE COURT:  Not right now.  Let me look at it.

(The Court reviewed Defendant's Exhibit 1371.)

THE COURT:  Counsel, please approach.

(The following proceedings were had at the bench outside the hearing of the jury:)

THE COURT:  Yes, Mr. Edney.

MR. EDNEY:  Your Honor, the Defense Exhibit 1371 is not being offered for the truth of the matter asserted. Rather, it's being offered for its effect on the listener.

In addition, we laid a foundation with Ms. Saiz about the manner in which she kept her records, about how she would

consult her binder and this document to determine what she's been told by the UML and that she needed it to have a complete understanding of what she's been told.

This case is about --

THE COURT:  Hold it down just a little bit.

MR. EDNEY:  This case is an effort in making a fraud-based omission case about what Commuter Air Technologies had not been told.  Given that foundation, this is absolutely indispensable to completing the record about what the UML had been told, and it is not hearsay.

THE COURT:  Government.

MS. PERRY:  Your Honor, it's an out-of-court statement by Mr. Keogh, who is a party, and we believe that it's an out-of-court statement.  I just dispute it.

I think that what Mr. Edney is seeking to introduce the statement for is the truth of the matter asserted related to the contracting issues related to DFAS and the modification.

THE COURT:  Well, the way I view this document -- and it's an e-mail chain; it's got several entries in it -- but, in substance, it seems to be a conversation taking place between this witness and Dr. Keogh.  I think it actually just kind of duplicates some of those conversations.

But, in any event, this witness has testified at length about what she was being told or wasn't being told by Dr. Keogh, and she's also testified just a few minutes ago

that her main contacts on billing issues with the UML were Dr. Keogh and Jennifer Cowan.

And this document at least introduces a couple of other sources of information, presumably going forward from August 15th, for her regarding payments from UML.

And, you know, technically, the government is correct that statements by Mr. Keogh would be hearsay offered by his counsel, but these statements do add context to the witness' own statements, both contained in the e-mail and that she's already testified to.

And so I'm going to -- I'm going to let this one in.  I think it's -- it provides some important context, and we'll see where counsel goes with it.

If you have another objection that flows from future questioning, you can make it.  But I'm going to overrule the objection to this document and admit it.

MS. PERRY:  Your Honor, just for clarification, is that for the limited purpose that Mr. Edney described and not for the truth of the matter asserted?

THE COURT:  Yeah.  He's described what he's using it for.  But if it's -- if it's not hearsay because he's not offering it for the truth of the matter -- but I think your explanation was you were using it for --

MR. EDNEY:  The effect on the listener, your Honor.

THE COURT:  -- the effect on the listener, that

perhaps she took other avenues or had other avenues of communication open to her, then, you know, it's admissible for that purpose. It's not hearsay for that purpose.

So, yeah, I'm going to hold him to why he said --

MS. PERRY: Your Honor, our concern is that this is a statement -- an out-of-court statement by Mr. Keogh that is self-serving hearsay.

Our concern is that Mr. Edney will try to use it later not for the purpose he's just articulated but instead to try to shift blame to Jennifer Cowan or Ken Viera. You know, if he later tries to use this document for a different purpose than he's articulated, we would object to that.

THE COURT: Well, then you can make that objection if it presents itself in the future. All right?

MR. EDNEY: Thank you, your Honor.

THE COURT: All right.

MR. STEPHENS: Judge, I'm sorry. Mr. Bailey just indicated that I believe the witness has indicated she needs a comfort break.

MR. EDNEY: I have three minutes left.

THE COURT: Okay. Well, when you started out you said, I just have a handful of questions for you, and that was over an hour ago. So I'm wondering how big your hands are, Mr. Edney.

MR. EDNEY: I actually mean it this time.

THE COURT:  Okay.  So three minutes and then we'll take a break.

MR. EDNEY:  Okay.

THE COURT:  Is that what you said?

MR. EDNEY:  Maybe five.

THE COURT:  Three to five.

MR. EDNEY:  Got it.

(The following proceedings were had in open court:)

THE COURT:  The objection is overruled.

Ms. Saiz, I know that you're needing to take a break -- comfort break, but counsel has told me that he's got three to five minutes left with you.

THE WITNESS:  Okay.

THE COURT:  Is that okay to go three to five more minutes?

THE WITNESS:  Okay.

THE COURT:  All right.

Proceed.

Q   (By Mr. Edney) And to reiterate what the Court said, if you really want to go right now we can --

A   Is it going to be really three to five minutes?

Q   I think so.

A   Okay.

Q   Somebody -- he's going to time me.

A   Okay.

Q    I know he is.

THE COURT:  I can assure you it's going to be three to five minutes.

THE WITNESS:  Okay.

Q    (By Mr. Edney) Well, there we go.  All right.

MR. EDNEY:  So let's pull up Defense Exhibit 1371 on the screen.

Q    (By Mr. Edney) And this is the e-mail you were looking at.  I want to direct your attention to the first couple of sentences of the first paragraph.  They read as follows:

"Jennifer, the real authority on these issues are Jennifer Cowan and Ken Viera.  Jennifer has been in regular contact with SOCOM.  Ken spoke with the SOCOM contracting officer who gave more insight than what had been given to Jennifer.  The mod that had to be completed was not by DFAS or the SOCOM contracting officer."  And then he provides a whole bunch of additional details.

Down at the bottom -- not all the way at the bottom but at the bottom of that paragraph, the second -- third to last sentence, he says as follows:  "As I said, I am relaying information I'm getting here directly from Jennifer Cowan and Ken Viera."

Do you see that?

A    I do.

Q    Now, Ms. Saiz, was it your understanding, after reading

this e-mail, that Jennifer Cowan and Ken Viera were in regular contact with the government?

A    Per this e-mail, yes.

Q    And was Dr. Keogh inviting you to ask any additional questions of Jennifer Cowan and Ken Viera about what the status of payments were with the United States Government?

A    At this point, yes.

Q    And do you recall asking any of those questions of Ms. Cowan or Mr. Viera?

A    Yeah.  I mean, the e-mail shows that it originated with my staff and Jennifer Cowan, and I think my comment here says:

    "Jennifer provided us an update but nothing has changed from the last two previous weeks."

    So, again, I'm trying to apply pressure on either SOCOM, DFAS, DCAA, DCMA.  Is there any pressure we can apply?

Q    Yeah.  And -- but you knew from Dr. Keogh that you had an open invitation to ask additional questions of these subject-matter experts, Ms. Cowan and Mr. Viera; right?

A    That's where we always -- well, with Jennifer Cowan, that's where we always initiated it.

Q    And he's opening up Mr. Viera to you, too; right?

A    At this time, yes.

Q    And he's talking about how they're in regular contact with the government and these are the real experts; right?

A    Yes.  In this e-mail, yes.

*CROSS-EXAMINATION OF JENNIFER SAIZ*

Q    Okay.  Let me take you to just the very beginning of the whole Commuter Air Technologies relationship.  I just have four or five questions.

So in 2010, the Special Operations Command had an interest in working with Commuter Air Technologies; right?

A    Correct.

Q    And they had obtained funding for CAT's work; correct?

A    That's correct.

Q    But Commuter Air Technologies needed an institution like UML, that had an existing contract vehicle with the Special Operations Command, in order to do that work; right?

A    Right.  The contract vehicle with the appropriate Statement of Work.

Q    Yeah.  And if -- if you did not find a partner with that contract vehicle, you would have had to work with Special Operations Command on your own to set up one; right?

A    That's correct.

Q    And that could have taken anywhere between eight months and two years; is that right?

A    That is correct.

Q    And partnering up with UML allowed you not to have to engage in price competition with any other parties; right?

A    That's correct.  Because it was a direct award.

Q    It was one of those sole source no bid contracts; right?

A    Right.

Q    And the UML contract had a ceiling on it; is that right?

A    That is correct.

Q    And one of the things CAT, working with the UML, did was eat up part of that ceiling so the UML couldn't do work directly for SOCOM, at least for that portion of it; right?

A    That is correct.

Q    Okay.

MR. EDNEY:  So did I hit the mark?

THE COURT:  You did.

Q    (By Mr. Edney) All right.  I have no further questions for you at this time.  Again, I very much appreciate you coming in and spending the time with all of us today.

MR. EDNEY:  Thank you, your Honor.

THE COURT:  All right.  Ladies and gentlemen, it's about 2:34.  We're going to go ahead and take a comfort break at this time.  Please be prepared to come back into the courtroom at five minutes after 3:00.  That's over 20 minutes.  With that, you may go.

Please remain seated while the jury departs.

(The jury exited the courtroom.)

THE COURT:  The jury has departed.

Ms. Saiz, you may step down.  Ms. Saiz, be prepared to come back in at 2:55 --

THE WITNESS:  Okay.

THE COURT:  -- or before.

(The witness exited the courtroom.)

THE COURT: All right. We'll be in recess until 2:55.

(A short recess was taken.)

THE COURT: Cross-examination, Ms. Behenna?

MS. BEHENNA: I just have two questions, your Honor -- well, a couple.

**CROSS-EXAMINATION**

<u>BY MS. BEHENNA</u>

Q   Ms. Saiz, we've seen lots of e-mails today, and I don't intend to go through all of those.

But from my review of those e-mails, I did not see Danielle Keogh included on any of those e-mail chains. Would you disagree with me on that?

A   I think I saw her name on one today, but that's it.

Q   Okay. And I'll go back through and look.

A   Yeah.

Q   But your primary point of contact with the U- -- or the persons who were your points of contact with the UML were Jennifer Cowan --

A   Yes.

Q   -- Mr. Keogh or Dr. Keogh --

A   Correct.

Q   -- Gary Gallagher --

A   Yes.

Q     -- and Richard Shultheis?

A     That is correct.

Q     Okay.

          MS. BEHENNA:  That's all I have, your Honor.

          THE COURT:  Redirect examination, government?

**REDIRECT EXAMINATION**

BY MS. PERRY

Q     Ms. Saiz, when Mr. Edney began your cross-examination, he asked you about a series of questions I asked you at the very end of your direct examination.

      Do you remember that?

A     Yes.

Q     And he asked you about --

          MS. PERRY:  Karen, can you pull up Government's Exhibit 201.

Q     (By Ms. Perry) Okay.  And he asked you about some markings I made on this exhibit during that time period.

      Do you remember that?

A     I do.

Q     Okay.  On direct examination, I asked you whether or not Mr. Keogh disclosed to CAT that the government had paid this money into the UML bank account.

      Do you remember that?

A     That is correct.

Q     Okay.  And if --

*REDIRECT EXAMINATION OF JENNIFER SAIZ*

MS. PERRY:  Karen, could you pull up Government's Exhibit No. 295.

Q    (By Ms. Perry) Do you remember looking at this document during cross-examination?

A    I do.

Q    Okay.  And in this e-mail, Mr. Keogh advised you that they were processing the funds through a trust account; is that right?

A    That is correct.

Q    From your years of government experience, have you ever had a prime contractor have to run funds through a trust account in order to pay the subcontractor?

A    Not in my experience.

Q    And if the government had paid the UML into its own bank account, do you know of any reason why UML could not have paid CAT what it was owed?

A    No.

Q    On cross-examination, Mr. Edney also asked you a series of questions about a payment glitch in July and August of 2012.

     Do you remember that?

A    Yes.

Q    And he showed you Defense Exhibit 1379.

     MS. PERRY:  Karen, do we have that?  Can you blow up the middle e-mail, please -- sorry, the middle e-mail.

*REDIRECT EXAMINATION OF JENNIFER SAIZ*

Further down.

Q    (By Ms. Perry) He showed you this e-mail discussing that the logjam was broken on September 12, 2012, and UML had started receiving payments.

Do you remember that?

A    Correct.

MS. PERRY:  Karen, can you pull up Government's Exhibit 201.  And can you highlight from the March 2012 flights down.

Q    (By Ms. Perry) If the logjam was broken on September 12th of 2012, and there was a payment glitch in July and August of 2012, do you know of any reason why CAT was not paid for the March 2012 invoices and the April 2012 invoices?

A    No, I do not.

MS. PERRY:  And, finally, Karen, can you pull up Government's Exhibit 212.

Q    (By Ms. Perry) On cross-examination, Mr. Edney also asked you about a problem with government payments under the 1903 contracts.

Do you remember that?

A    Yes.

Q    And he showed you a series of e-mails about whether or not UML would need to return funds to the government.

Do you remember that?

A    I do.

*REDIRECT EXAMINATION OF JENNIFER SAIZ*

Q    In front of you is a previously-admitted exhibit showing payments on contract 1903 for Division Order 2.

Do you see that?

A    Yes.

Q    And according to this exhibit, the government paid for the March 2011 flights and April 2011 flights at the end of May 2011 and on June 14th of 2011.

Do you see that?

A    I do.

MR. EDNEY:  Objection, your Honor.  Lack of foundation for use of this exhibit with this witness.

THE COURT:  Is this not an exhibit that you used?

MR. EDNEY:  It is not.

THE COURT:  Okay.  Hold on a second.

(The Court reviewed Government's Exhibit 212.)

THE COURT:  Counsel, I see no indication that this witness is involved in this exhibit.  So can you -- if you would like, you can try to lay a foundation, but so far the objection is sustained.

MS. PERRY:  Your Honor, my questioning is going to be related -- this is an exhibit that's previously been admitted.  I'm just reading it to her to ask her whether she had any knowledge of it.

THE COURT:  Well, you can ask her if she has any knowledge of the accuracy of the payment information set forth

*REDIRECT EXAMINATION OF JENNIFER SAIZ*

in here, but that's about as far as you can go right now.

All right.  Proceed.

MS. PERRY:  Karen, go ahead and take down the exhibit.

Q    (By Ms. Perry) Mr. Edney asked you during your cross-examination about the government wanting -- there being a problem with having to possibly return money to the government in that 2011 time period.

Do you remember that?

A    Yes.

Q    If UML had received funds from the government on a duplicate payment, if they had been paid twice, do you know of any reason why UML would not have been able to pay CAT's invoices?

A    No.  Because CAT was not paid twice.  It was only, according to the e-mail I received from Web, that they had been twice.  That was my only knowledge that UML had been paid twice.

So if CAT would have been paid twice, then I could understand why they were asking CAT to be part of that repayment process.  However, I didn't know when they were paid at any instance at any point in time.  So we always had to go off of what they told us.

And on the timing of the information provided by the DFAS government, the DCMA government, that was all towards the end

REDIRECT EXAMINATION OF JENNIFER SAIZ

of the contract.  Throughout the longevity, from beginning to end, there was no level of details provided for us at CAT.

MS. PERRY:  Your Honor, may I have a moment?

THE COURT:  You may.

(Brief pause.)

MS. PERRY:  That's all I have, your Honor.

THE COURT:  Recross based on that, Mr. Edney?

MR. EDNEY:  No, your Honor.  We have no further questions.  Thank you.

THE COURT:  Recross based on that, Ms. Behenna?

MS. BEHENNA:  No, your Honor.

THE COURT:  Government, may this witness be excused permanently or subject to recall?

MS. PERRY:  Permanently, your Honor.

THE COURT:  Any objection?

MR. EDNEY:  No, your Honor.  Thank you.

THE COURT:  Any objection, Ms. Behenna?

MS. BEHENNA:  No, your Honor.

THE COURT:  Ma'am, thank you for your testimony. You are permanently excused.

THE WITNESS:  Thank you, your Honor.

THE COURT:  You may step down.

(End of requested excerpt.)

CERTIFICATE OF OFFICIAL REPORTER

I, Christina L. Clark, Federal Official Realtime Court Reporter, in and for the United States District Court for the Western District of Oklahoma, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

        Dated this 3rd day of May, 2022.


                            s/CHRISTINA L. CLARK_____
                            Christina L. Clark, RPR, CRR