# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **-vs-** | ) | **Case No. 17-CR-00290-D** |
| | ) | |
| **DANIEL WEBSTER KEOGH and** | ) | |
| **DANIELLE KEOGH,** | ) | |
| **a/k/a DANIELLE E. TRUITT,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANT'S REPLY TO THE UNITED STATES' SENTENCING MEMORANDUM

Michael J. Edney, DC Bar No. 492024
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue NW
Washington, DC 20037

- and –

Edward M. Blau, OBA No. 20626
BLAU LAW FIRM, PLLC
101 Park Avenue, Suite 600
Oklahoma City, OK 73012

***Counsel for Defendant Daniel Webster Keogh***

## **TABLE OF CONTENTS**

**Page**

DEFENDANT'S REPLY ..................................................................................................1-7

I.    The Court Should Reject the Government's Requested 18-Level Increase for Loss Amount Based on The Government's Unrelated Claims of How the Battery Loan Was Procured..........................................................................7-10

II.    The Court Should Reject the Government's Request for a Two-Level Enhancements for Sophisticated Means, Deriving More Than $1 Million in Gross Receipts, and Abuse of Position of Trust....................................................................................................................10-12

CONCLUSION................................................................................................................12-13

## TABLE OF AUTHORITIES

**Page**

### Federal Cases

*United States v. Castellano*,
  349 F.3d 483 (7th Cir. 2000) ................................................................11

*United States v. Copus*,
  110 F.3d 1529 (10th Cir. 1997) ..............................................................9

*United States v. Culver*,
  822 F. App'x 976 (11th Cir. 2020) ........................................................10

*United States v. Diamond*,
  969 F.2d 961 (10th Cir. 1992) ...............................................................9

*United States v. Griffith*,
  584 F.3d 1004 (10th Cir. 2009) ..............................................................8

*United States v. Smith*,
  705 F.3d 1268 (10th Cir. 2013) ..............................................................8

*United States v. Tanke*,
  743 F.3d 1296 (9th Cir. 2014) ..............................................................10

*United States v. Weidner*,
  437 F.3d 1023 (10th Cir. 2006) .............................................................12

*United States v. Wilson*,
  980 F.2d 259 (4th Cir. 1992) .................................................................9

### Rules

Federal Rule of Criminal Procedure 11 .............................................................4

### Guidelines

U.S.S.G. § 1B1.3 ..........................................................................................8

Defendant, Dr. Daniel Webster Keogh ("Dr. Keogh" or "Defendant"), by and through undersigned counsel, respectfully submits this Reply to the Sentencing Memorandum ("Government's Sentencing Memorandum") filed by the United States government (the "Government") on April 5, 2023.

The Defendant thought it was possible that his sentencing memorandum ("Def. Mem."), simultaneously filed with the Government Sentencing Memorandum on April 5th, would be his only written submission on the issue of sentencing. As such, counsel for the Defendant attempted to anticipate as many of the Government's arguments as possible and to respond to them in that filing. Having gone through a multi-year case and a multi-week trial with the Government, the Defendant for the most part correctly anticipated what the Government would argue. The Defendant is very grateful for the Court's indulgence of a lengthy sentencing memorandum in this complex case and so will not repeat its anticipatory replies here. Instead, this filing is dedicated to addressing a handful of factual assertions and legal authorities raised in the Government's Sentencing Memorandum and not fully addressed in the Defendant's Sentencing Memorandum.

One paragraph of the Government's Sentencing Memorandum put the issue before the Court in the forthcoming sentencing very well and succinctly. To quote it in full:

> The Court's determination of the relevant conduct for Count 10 will substantially impact the remaining guidelines enhancements at issue and the resulting advisory range. *The parties found a narrow path to resolve this matter and avoid a protracted trial*: Mr. Keogh would plead guilty to a false-statement count from October 2012 and to a conversion count related to an unauthorized $1.5 million transfer of OSU-UML funds. That narrow path, however, left substantial questions about restitution and relevant conduct to be decided by the Court at sentencing.

1

Government Sentencing Memorandum ("Gov't Mem.") at 6 (emphasis added). That is all correct. The plea agreement was a "narrow" one regarding Dr. Keogh's handling of a difficult time in October 2012 after Lawrence Livermore National Laboratories ("LLNL") failed to deliver on what it said its battery production capabilities were and when the United States Government had significant delays in making payments on the OSU-University Multispectral Laboratories' ("OSU-UML") government contracts. At that time, Dr. Keogh omitted certain facts from a status report on the battery project. And he caused the deposit of $1.5 million in OSU-UML funds into a trust represented to be in the safe hands of the Squire Sanders law firm. Everyone – including the Government – agrees that the OSU-UML and Dr. Keogh were defrauded by the Squire Sanders law firm partner, Patrick O'Donnell, who remains at complete liberty today.

The Government's Sentencing Memorandum is dedicated to taking this "narrow" resolution and seeking to hold Dr. Keogh "accountable" for alleged criminal action in procuring the battery loan in the first place. Dr. Keogh did not plead guilty to any criminal action in obtaining the loan and the Government did not and cannot prove that his behavior in obtaining that loan was a crime.

In its effort to leverage a broad punishment from this "narrow" resolution, the Government's Sentencing Memorandum suffers from many of the same shortcomings as its trial presentation, which resulted in its failure to secure a conviction on any count. Despite the parties and the Court having participated in a three-week trial, the Government still never deals with the significant evidence contrary to its position adduced during cross-examination. The Government's Sentencing Memorandum continues to contend that Dr.

Keogh illegally concealed from the bank that the battery project was really a "research and development project" on which LLNL was taking the lead.  Gov't Mem. at 8.  But the Government chooses not to deal with the statements of LLNL when the battery project started that its technology was so advanced that this was not a "research and development project" but instead a "design build project."  Def. Mem. at 15 (*see also* Exhibit 1027).  Nor does the Government deal with the written concessions of a key Government witness from a year after the battery project started that LLNL's technology "was not as advanced as the original cost/schedule…suggests."  Def. Mem. at 20-21 (*see also* Exhibits 1101 pg. 3, 112, Yamamoto Tr. 249:6 – 250:6, 251:2 – 9, 258:1 – 22, 261:9 – 25, 262:7 – 13.) And the Government does not address the testimony of the bank's loan officer, Randy Allison ("Mr. Allison"), that he was aware that the battery project was being run by Lawrence Livermore in early 2011, as he was releasing loan funds, and did not find that fact concerning or alarming.  Def. Mem. at 19 (*see also* Allison Tr. 68:15 – 69:6, 98:20 – 99:15, 130:4 - 14).  That is because Mr. Allison was aware from the beginning that the electromechanical battery had to be developed, was high technology that could not be purchased off-the-shelf, and was so advanced that the reason for developing the battery was for the Department of Defense to study it.  Def. Mem. at 19 (*see also* Allison Tr. 45-17-21, Tr.146-4 – 12, Tr. 105-24 – 107-9, Tr. 93-20 – 94-14, Tr.94-22 – 95-4, Tr. 98-2 – 9, *also see* Exhibits 1055 pg. 4, 2201 pgs. 15, 17, 24 - 26, 49 - 50)*.*

Lawrence Livermore's failure to make progress on developing and building a battery prototype, for study by the Department of Defense, was a profound disappointment to everyone involved in the battery project from the Keogh side, including Government

3

witness Drew Tait. Def. Mem. at 19 (*see also* Exhibit 1102 and Tait Tr. 461:22-462:6-20). This case is about whether Dr. Keogh dealt appropriately – in his company's October 2012 status report to the bank – with LLNL's misrepresentations about what it could and would do and its resulting failure to perform. Although his actions constituted a deviation from the right course, there is not a "common scheme" or continued course of events with the procurement of the loan.

Although long known to the Government, these facts and documents all came out on cross-examination at trial. Rarely were facts in tension with the Government's argument affirmatively addressed in direct examination. And the Government's Sentencing Memorandum – even at this late stage – does not attempt to deal with the full record. The Court should reject the Government's effort to broaden the parties' "narrow" resolution reached in the plea agreement.

One thing the Government's Sentencing Memorandum makes clear is that, if it cannot establish criminal conduct in procurement of the loan, a sentence near the high-end of the Rule 11(c)(1)(C) range and multi-million-dollar restitution is not appropriate. The Government makes no case for the massive "loss adjustment" that drives its multi-year Guidelines range or for any restitution in the battery case unconnected to turning Counts 1-9 into proven crimes. If the Court rejects the Government's effort to prove the rest of its case to which there has been no plea, the Government effectively concedes that the Defendant's calculations of a Guidelines range between zero and six months of imprisonment and no restitution on the battery issue is appropriate. For the reasons in the Defendant's Sentencing Memorandum, the Court should sentence the Defendant to a term

4

of zero months of imprisonment (or at most a short period of home confinement) and to no restitution.

Divorced from the proof at trial, the Government closes with a recitation of all the bad things the Government thinks Dr. Keogh did while leading the OSU-UML.  Gov't Mem. at 27-30.  Remarkably, the Government begins with a list of civil settlements that it wishes to hang on the Defendant's conduct. *Id.* at 27-28.  The Court will recall that the Government fought tooth and nail to keep mention of some of these civil cases anywhere in earshot of the trier of fact. (ECF Nos. 121 and 321).  That is because First Pryority Bank, after the full benefit of civil discovery, dropped its fraud and breach of contract suit against Dr. Keogh on the eve of  these claims being subjected to adversarial testing.  It is also because Oklahoma State University had agreed that it was fully compensated for any harms to it by Dr. Keogh's assiduous prosecution of a fraud case against the Squire Sanders law firm and the sharing of that recovery with Oklahoma State University.  (Affidavit C. Haines April 4, 2023; September 11, 2018 Hearing). The Government also surfaces, without any detail, suggestions that the laboratory mishandled government contracts, leading to a laboratory civil settlement with the Government.  The Government says nothing about the complex testing range rental rates at issue in that settlement, which have nothing to do with this case. It also suggests that an agreed judgment for one of the other investors on the battery project, when LLNL failed to perform, is the result of Dr. Keogh's conduct.  This scattershot and undetailed reference to civil resolutions should be set aside.

The Government also cannot seem to decide whether it stands by its agreement that its allegations about the treatment of Commuter Air Technologies in 2011 and 2012, as

5

represented by Counts 12-20 of the Superseding Indictment, *are not relevant conduct for sentencing. Compare* Gov't Mem. at 27-29 *with* Keogh Plea Agreement at 4. More than half of the Government's closing argument for sentencing is dedicated to unproven claims of misconduct regarding the handling of funds due to Commuter Air Technologies.  The Court should disregard these arguments and hold the Government to the promise it made to induce the plea agreement that it would not argue that the CAT conduct is relevant to sentencing.  Keogh Plea Agreement at 4.

Then, there is a narrative that Dr. Keogh was running the laboratory not for its benefit, but to enrich himself and his family.  Gov't Mem. at 28. If that were Dr. Keogh's objective, he did a horrible job of it.  His time at the laboratory left him penniless, as he personally loaned $293,000 to the Laboratory to ensure its continued existence (ECF 304-36), liquidated his own retirement accounts to make payments on the First Pryority Loan, dedicated himself to helping the bank recover on the loan and to pursuing Patrick O'Donnell and the Squire Sanders law firm for their fraud Def. Mem. at 57.  These are not the actions of a man out for only his own enrichment, and the Government should save those stock themes for the many other white-collar prosecutions they actually fit.

Also missing from the Government's account is the fraud of Patrick O'Donnell and the Squire Sanders law firm.  The Government mentions it just once.  Gov't Mem. at 24. It later dives into the deposits in trust with the Squire Sanders law firm, calling them "shady transfers" as almost to suggest that Dr. Keogh was in cahoots with Patrick O'Donnell. Haven't we already been over this?  That misconception was the driving force behind the Government's decision to charge Dr. Keogh in the first place, labelling him and Mr.

6

O'Donnell as co-conspirators.  That Government dropped that claim in its Superseding Indictment, as it was embarrassingly contrary to all available evidence.  Indeed, this Court ruled that additional evidence that the OSU-UML and Dr. Keogh were defrauded as cumulative because it was so obvious. Def. Mem. at 10.  The Court should not indulge these Government suggestions now.

The Government's three closing pages are dedicated to how it seeks to transition the "narrow resolution" represented in the plea agreement (Gov't Mem. at 6) into a purported "crime spree" (Gov't Mem. at 30).  They are thoroughly unpersuasive. Dr. Keogh accepts responsibility for the conduct to which he plead guilty.  It was a "narrow" resolution, focused on shortcomings in Dr. Keogh's handling a difficult situation facing the OSU-UML in September and October 2012.  The Court should reject the Government's efforts to broaden it at this very last stage.

I.   **The Court Should Reject the Government's Requested 18-Level Increase for Loss Amount Based on The Government's Unrelated Claims of How the Battery Loan Was Procured.**

The Government errs in attempting to inflate the proper sentencing calculation by arguing that conduct which (1) is unrelated to Dr. Keogh's offense of conviction and (2) has not been proven by the Government by a preponderance of the evidence should be considered "relevant conduct" for sentencing purposes.  Gov't Mem. at 6-26.  "The parties found a narrow path to resolve this matter and avoid a protracted retrial: Mr. Keogh would plead guilty to a false-statement count from October 2012 and to a conversion count related to an unauthorized $1.5 million transfer of OSU-UML funds." *Id.* at 6.  As the Presentence Investigation Report ("PSR") observes, "Count 10 alone, with no further relevant conduct,

7

consists of a simple false statement regarding the status of the battery and would not result in application of the enhancement." PSR at 17.

"For a district court to consider a defendant's conduct as 'relevant' under the U.S. Sentencing Guidelines, the Government must prove by a preponderance of the evidence that the defendant (1) engaged in conduct (2) related to the offense of conviction pursuant to U.S. Sentencing Guidelines Manual § 1B1.3 and (3) constituting a criminal offense under either a federal or a state statute." *United States v. Griffith*, 584 F.3d 1004, 1011 (10th Cir. 2009). As set forth above and in the Defendant's Sentencing Memorandum, Dr. Keogh's actions in procuring the battery loan are not criminal, and that should be the end of the matter. They are also not "part of a common scheme." Gov't Mem. at 12. The Government tries to piece together the battery loan into one large event, from 2010 to late 2012. But the handling of the loan was punctuated by the revelation – in the middle of 2011 – that LLNL had misrepresented the state of its technology and its capability to deliver the requested battery prototype on time and on budget. Dr. Keogh's representations to the bank tracked with what LLNL told his team in 2010. Dr. Keogh's handling of the project after those third-party representations turned out not to be true is what is at issue in the plea agreement. As a matter of law, it is not part of a common scheme. *see United States v. Smith*, 705 F.3d 1268, 1274–75 (10th Cir. 2013) (explaining that a common criminal purpose must pervade all elements of alleged conduct to constitute relevant conduct) *and United States v. Wall, 180 F.3d 641, 645* (5th Cir. 1999) (rejecting inclusion of conduct as a common scheme when conduct the Government sought to link involved different time periods and different rationales).

Contrary to the Government's argument in a footnote (Gov't Mem. at 14 n.7), this is a case where the "bank loan legitimately is obtained by one who subsequently submits a statement that is required in connection with the loan and that statement is false," such that the amount of the loan itself is not considered the "loss" from the conduct. *United States v. Copus*, 110 F.3d 1529, 1535 (10th Cir. 1997). The Tenth Circuit has made clear that the Guidelines' "loss adjustment" should be limited to losses which "can be attributed to the false statement." *Copus*, 110 F.3d at 1535. Even if the loan has an outstanding balance at the time of the statement, the Court must subtract from that balance "the estimated amount the bank would have lost had the statement not been false." *Id.* (quoting *United States v. Wilson*, 980 F.2d 259, 262 (4th Cir. 1992). And the Dr. Keogh demonstrated in Defendant's Sentencing Memorandum that the statement in the October 2012 financial statement, made long after all loan proceed were distributed, caused no loss, as the bank's ability to recover would not have been materially advanced if it began its efforts after making inquiries about a more fulsome disclosure of project status in October 2012 as opposed to a few months later, when Oklahoma State University ordered Triton to stop making payments. Def. Mem. at 50-51

Importantly, the Government's position on "relevant conduct" does not affect the issue of restitution. Def. Mem. at 43. Relevant conduct *cannot* be used for purposes of calculating restitution. Def. Mem. at 48-49. As the Tenth Circuit made perfectly clear in *United States v. Diamond*, a district court "exceed[s] its jurisdiction under §3663 by directing [the defendant] to pay restitution for losses caused by conduct other than the specific offense for which he stood convicted[.]" 969 F.2d 961, 965 (10th Cir. 1992).

9

The Government is also incorrect to claim that "the PSR recommends that the Court order restitution" in the amounts sought by the Government. Gov't Mem. at 10 (citing PSR ¶¶ 25, 105). In the cited paragraph, the PSR is only reciting "[t]he government's position on restitution," not recommending it. *Id.* Further contrary to the Governments assertion, the parties did not "agree that the Court should order restitution for Count 21 in the amount of relevant conduct, after applying proper credit for any payment made to OSU-UML, before sentencing." Gov't Mem. at 18. Rather, the Defendant "specifically reserve[d]the right to argue that there is no victim, no relevant conduct, or restitution for any offense of convection" in the plea agreement. Keogh Plea Agreement at 4.

## II. The Government's Cited Newly Cited Authority in Support of Requests for a Two-Level Enhancements for Sophisticated Means and Deriving More Than $1 Million in Gross Receipts Is Distinguishable.

The Defendant's Sentencing Memorandum also rebuts the Government's case for each of the Guidelines enhancements it seeks. Contrary to the Government's claims, the cases cited by the Government do not support the application of a sophisticated means enhancement in this case. Gov't Mem. at 20. In each of the cited cases, false invoices were just one element of the far broader, sustained, and more complex forms of deception used – not the determining factor in the courts' findings that the defendants had employed sophisticated means. For example, in *United States v. Culver*, the defendant wrote a letter that he claimed came from the CEO of a government contracting firm and used it to help to win bid and then employed a complex invoicing system so that the school board would not find out that the money was ultimately going back to him and his company. 822 F. App'x 976, 978 (11th Cir. 2020). In *United States v. Tanke*, the defendant created six false

10

invoices, demanded payment on the false invoices for bogus consulting fees, falsified carbon copies of checks, and diverted checks payable to others into his own account. 743 F.3d 1296, 1299 (9th Cir. 2014). Likewise, in *United States v. Sheppard*, the defendant sent "multiple invoices that falsely stated sales of cattle or the number of cattle sold. [The defendant] deposited the money he received based on the fictitious invoices into his personal bank account." 154 F. App'x 849, 850 (11th Cir. 2005).

The facts of these cited cases are nothing like those surrounding the disputed inconsistences in invoices here. In each of these cases cited by the Government, the defendants were employing complex schemes in order with documents purportedly from third parties that were just completely made up. That is not the case here. The invoices in question were documents of the Defendant's companies themselves, not fabricated documents from third parties. The Government criticizes those documents as not disclosing enough facts, such as the role of Livermore in building the battery. Of course, the bank was fully aware of Livermore's role around the time of the invoices. Def. Mem. at 19 (*see also* Allison Tr. 68:15 – 69:6, 98:20 – 99:15, 130:4 – 14). But Government claims about shortcomings in the level of disclosure in a company document is no analog to forging false documents from third parties.

The cases cited by the Government on the question of gross receipts, despite its characterizations, refute its position. Gov't Mem. at 27. The Government cites *United States v. Castellano*, explaining that in that case the court "refused to apply the gross-receipts enhancement for a defendant who was the founder and principal manager of a corporation receiving the proceeds, but '[l]ess than $200,000 reached [the defendant] as

11

salary or reimbursement of his expenses.'"  349 F.3d 483, 485–87 (7th Cir. 2000).  The Government further cites *United States v. Weidner*, explaining that the "the Tenth Circuit ruled that one defendant cannot trigger this enhancement for money actually received and controlled by another defendant." 437 F.3d 1023, 1046 (10th Cir. 2006).  Dr. Keogh held minority ownership interests in both The Keogh Group, LLC (38% interest) and EMBE Inc. (2,250,000 shares), but never owned either entity outright.  *See* Defense Exhibit 1110. That fully distinguishes this case from those cited by the Government, which involved wholly owned alter egos of the defendant in question there.  Likewise, the Government makes no attempt to show that the funds ever went from the corporate entities to Dr. Keogh. That is because they did not.  Instead, the corporate entities that Dr. Keogh is affiliated with were extremely temporary conduits for the funds to flow from one federal government entity to another federal government entity.  This simple and agreed upon fact is fatal to the Government's argument for a gross receipts enhancement.

### Conclusion

The Government's Sentencing Memorandum presents a straightforward choice for the Court.  It presents no argument for sentencing the Defendant at the top end of the Rule 11(c)(1)(C) range and for multi-million-dollar restitution that does not depend on the Government proving that the procurement of the battery loan – two years before the conduct plead to – was criminal.  With regard to the deposit into Squire Sanders trust funds, the Government remains unwilling to substantively address the effects of the independently criminal and fraudulent conduct of Patrick O'Donnell and the Squire Sanders law firm, an issue it conceded at trial.

12

Dr. Keogh made mistakes in handling a difficult situation in September and October 2012. He pled guilty to those mistakes in a "narrow resolution" to avoid a "protracted retrial" that would consume the time and resources of the parties and the Court. Gov't Mem. at 6. He takes responsibility for those mistakes, and the Court should address those mistakes in sentencing. At the same time, the Court should reject efforts to expand this narrow resolution into a broad punishment. When focused on the conduct subject to the plea – as opposed to wide ranging "crime spree" (Gov't Mem. at 30) the Government failed to prove at trial – the Defendant's urged sentence of zero restitution (or a short period of home confinement) and minimal restitution is appropriate. The Defendant reminds the Court of the passage of time since the conduct, the Government's shifting and abandoned theories of criminal liability (from violation of not-then-existing USDA regulation to acting in cahoots with Patrick O'Donnell and the Squire Sanders law firm), and the acute need of the Defendant in the care of his daughter, detailed in his primary sentencing memorandum. No public purpose, no end of justice, would be served by incarcerating the Defendant or converting him into a life-long financial serf to a restitutionary judgment.

May 5, 2023

Respectfully submitted,

By: */s/ Michael J. Edney*
Michael J. Edney, DC Bar No. 492024
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 955-1500
Facsimile: (202) 778-2201
medney@huntonak.com

- and –

*/s/ Edward M. Blau*

13

Edward M. Blau, OBA No. 20626
BLAU LAW FIRM, PLLC
101 Park Avenue, Suite 600
Oklahoma City, OK 73012
Telephone: (405) 232-2528
Facsimile: (405) 232-2532
edblau@blaulawfirm.com

*Counsel for Defendant Dr. Daniel Webster Keogh*

## CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2023, I caused the foregoing document to be filed

electronically with the ECF System, which will send a copy to all attorneys of record.

*/s/ Michael J. Edney*
Michael J. Edney

14